660 A.2d 97

Ronald W. McCLELLAN and Harold Shotel, Co–Executors of the Estate of Marilyn M. McClellan, Deceased, Appellants,

v.

HEALTH MAINTENANCE ORGANIZATION a/k/a HMO of Pa.

Ronald W. McCLELLAN and Harold Shotel, Co–Executors of the Estate of Marilyn M. McClellan, Deceased, Appellants,

v.

Joseph A. HEMPSEY, D.O.

Superior Court of Pennsylvania.

Argued April 6, 1995.

Filed June 2, 1995.

Joseph L. Messa, Jr., Philadelphia, for appellants.

Brian D. Rosenthal, Philadelphia, for appellants.

Kenwyn M. Dougherty, Philadelphia, for Health Maintenance, appellee.

Before CIRILLO, JOHNSON and SAYLOR, JJ.

CIRILLO, Judge.

Ronald W. McClellan and Harold Shotel, co-executors of the estate of Marilyn M. McClellan ("Appellants"), appeal from the order entered in the Court of Common Pleas of Delaware County granting in part and denying in part Appellants' motion to strike Health Maintenance Organization of PA a/k/a HMO PA Foundation and United States Healthcare of PA, Inc. d/b/a HMO PA. (hereinafter collectively referred to as "HMO PA"), and Joseph A. Hempsey, D.O.'s objections to request for production of documents. For the reasons stated below, we reverse and remand this case for proceedings consistent with this opinion.

In 1987, Appellants commenced a medical malpractice action against Dr. Hempsey. In 1989, Appellants commenced a separate action against HMO PA, averring, *inter alia*, claims of ostensible agency and corporate liability for failing to retain competent physicians and to continue to screen and review those physicians to assure their competence.

Specifically, Appellants complained that Dr. Hempsey, a physician chosen from a HMO provided list, failed to test a mole he removed from the decedent, Marilyn McClellan, who later died from malignant melanoma. Appellants alleged that the negligence of HMO PA in selecting and retaining Dr. Hempsey contributed to the decedent's death. In addition to their corporate negligence theory, Appellants also alleged that HMO PA was liable for breach of contract and misrepresentation based upon the express representations made by HMO

PA concerning the competency of its primary care physicians and the availability to subscribers of consultation and treatment by medical specialists whenever warranted through primary care referrals. The two actions were consolidated.

HMO PA filed preliminary objections in the nature of a demurrer to Appellants' complaint, challenging Appellants' theories of recovery. The trial court sustained the preliminary objections, and the Appellants appealed to this court. On appeal, this court reversed the trial court's ruling, *McClellan v. Health Maintenance Organization of PA*, 413 Pa.Super. 128, 604 A.2d 1053 (1992) (*"McClellan I "*), and reinstated Appellants' complaint. We remanded the case for trial, but limited the scope of the corporate negligence doctrine as it applied to HMO PA by imposing only two of the four duties outlined in *Thompson v. Nason Hosp.*, 527 Pa. 330, 591 A.2d 703 (1991). *McClellan I*, 413 Pa.Super. at 137–43, 604 A.2d at 1058–60.

■ In *Thompson, supra,* our Supreme Court ruled that because "the corporate hospital of today has assumed the role of a comprehensive health center," it may be subject to liability under the theories of respondeat superior, ostensible agency, and/or corporate negligence. *Thompson*, 527 Pa. at 338–40, 591 A.2d at 706–707. With respect to the corporate negligence theory, the Court opined as follows:

> Corporate negligence is a doctrine under which the hospital is liable if it fails to uphold the proper standard of care owed the patient, which is to ensure the patient's safety and well-being while at the hospital. This theory of liability creates a nondelegable duty which the hospital owes directly to a patient.
>
> .    .    .    .    .
>
> The hospital's duties have been classified into four general areas: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and

enforce adequate rules and policies to ensure quality care for the patients.

*Id.* (citations omitted).

Comparing and contrasting hospitals with HMOs, particularly Independent Practice Association HMOs ("IPA model HMOs"), this court, in *McClellan I, supra,* noted that, "While HMO PA could be viewed as having 'assumed the role of a comprehensive health center,' only two of the four duties defined by the Court in *Thompson* could be imposed.upon a modified IPA model HMO since such an HMO has no facilities or equipment and thus cannot 'oversee ... patient care [within its walls]'." *McClellan I,* 413 Pa.Super. at 140, 604 A.2d at 1059 (citing *Thompson,* 527 Pa. at 339–40, 591 A.2d at 707). We did find it reasonable, however, to require that an IPA model HMO "select and retain only competent physicians" and "formulate, adopt and enforce adequate rules and policies to ensure quality care for [its subscribers]." [1]  *Id.*

Upon remand, Appellants filed three requests for production of documents. On June 29, 1993, the Honorable Kenneth A. Clouse entered an order requiring HMO PA to produce the requested documents. HMO PA objected to Appellants' requests, claiming the privilege granted by the Pennsylvania Peer Review Protection Act, 63 P.S. § 425.1 *et seq.* (hereinafter referred to as "PRPA"). In response, Appellants filed a motion to strike objections and to compel discreet responses to the requests for production of documents.

1. In *McClellan I,* citing to Section 323 of the Restatement (Second) of Torts, we found that in order to state a cause of action against an IPA model HMO, the complaint must contain factual allegations sufficient to establish the legal requirement that the HMO has undertaken:
   (1) To render services to the plaintiff subscriber;
   (2) which the HMO should recognize as necessary for the protection of its subscriber;
   (3) that the HMO failed to exercise reasonable care in selecting, retaining, and/or evaluating the plaintiff's primary care physician; and
   (4) that as a result of the HMO's failure to use such reasonable care, the risk of harm to the subscriber was increased.
   *McClellan I,* 413 Pa.Super. at 140–41, 604 A.2d at 1059.

On October 12, 1993, Judge Clouse entered an order sustaining HMO PA's objections to document requests numbers five through eight of Appellants' original request for production of documents, and document request number three of Appellants' first supplemental request for production of documents on the grounds that those documents are protected by the PRPA.[2] Appellants filed a motion to reconsider the October 12th order, which was denied. Thereafter, Appellants filed a second motion for reconsideration seeking reconsideration of the previous order or, in the alternative, seeking the trial court to certify the issue for appeal. 42 Pa.C.S.A. § 702(b). The trial court certified the issue for appeal, and this court granted Appellants' petition for permission to appeal. Pa.R.A.P. 301, 1301–23. Appellants present two issues for this court's consideration:

(1) Does the PRPA preclude discovery of peer review material in an action against an Independent Practice Association Health Maintenance Organization ("IPA model HMO")?

(2) Even if an IPA model HMO is considered a professional health care provider, is the peer review material nonetheless discoverable because Appellants would themselves be

---

2. Document request number five seeks "any and all documents submitted to [HMO PA] ... regarding the application of [Dr. Hempsey] ... to [HMO PA] ... for acceptance as a primary care physician or otherwise as a participant under any U.S. Health Care HMO Plan."

Document request number six seeks "any and all documents reviewed by any review board or other investigative body for [HMO PA] ... in their investigation of [Dr. Hempsey] ... as an applicant for acceptance as a primary care physician...."

Document request number seven seeks "any and all reports, memos or correspondence relating to [HMO PA's] ... investigation of [Dr. Hempsey] ... as an applicant as a primary care physician with Defendants."

Document request number eight seeks "any and all reports, memos, correspondence or other documents or communication relating to the care and treatment rendered by ... [Dr. Hempsey] to his HMO primary care patients which were participating members of U.S. Healthcare and HMO PA, prior to 1987."

Document request number three of Appellants' supplemental document request seeks "any and all documents, writings or other communications reflecting or pertaining to inspections and/or follow-up inspections of Dr. Hempsey, his office and his practice from the date he became a U.S. Health Care Primary Care Physician to 1987."

without evidence to prove their corporate negligence claim against HMO PA?

The PRPA, 63 P.S. § 425.1 *et seq.*, was promulgated to ensure the protection of patients and the general public by maintaining high professional standards in the practice of medicine. *Cooper v. Delaware Valley Medical Center*, 428 Pa.Super. 1, 14, 630 A.2d 1, 7 (1993), *alloc. granted,* 536 Pa. 642, 639 A.2d 28 (1994). In order to foster the free and frank discussions by review organizations, however, the legislature built into the PRPA particular immunity and confidentiality provisions. *See* 63 P.S. §§ 425.3, 425.4. *See also Sanderson v. Bryan,* 361 Pa.Super. 491, 522 A.2d 1138 (1987). The official comments to section 425.1 of the PRPA provides that the PRPA is "[a]n Act providing for the increased use of peer review groups by giving protection to individuals and data who report to any review group." 63 P.S. § 425.1, Historical and Statutory Notes.

Section 425.4 contains the PRPA's confidentiality provision. It provides, in pertinent part:

The proceedings and records of a review committee shall be held in confidence and shall not be subject to discovery ... in any civil action **against a professional health care provider** arising out of the matters which are the subject of evaluation and review by such committee....

63 P.S. § 425.4 (emphasis added). With respect to this appeal, we must ascertain whether the trial court correctly found that HMO PA, as an IPA model HMO, is entitled to the protections of the PRPA. More specifically, we must determine whether HMO PA is a "professional health care provider" as defined by the statute.

When reviewing a statute, we are guided by the principles set out in the Statutory Construction Act, 1 Pa. C.S.A. §§ 1501–1991. The object of all statutory interpretation is to ascertain and effectuate the intention of the General Assembly. 1 Pa.C.S.A. § 1921(a). Whenever possible, we must interpret a statute according to the plain meaning of its language. In that light, the rules of statutory construction

provide, in part, that "words and phrases shall be construed according to the rules of grammar and according to their common and approved usage." 1 Pa.C.S.A. § 1903; *Commonwealth v. Bell,* 512 Pa. 334, 339, 516 A.2d 1172, 1175 (1986); *Fireman's Fund Ins. Co. v. Nationwide Mut. Ins. Co.,* 317 Pa.Super. 497, 502, 464 A.2d 431, 434 (1983). When the words of the statute are clear and free from all ambiguity, we will not disregard the letter of the law under the pretext of pursuing its spirit. 1 Pa.C.S.A. § 1921(b).

■ A "professional health care provider" means "individuals or organizations who are approved, licensed, or otherwise regulated **to practice or operate** in the health care field . . . including, but not limited to, the following individuals or organizations:"

(1) A physician.

*       *       *       *       *       *

(11) A corporation or other organization **operating** a hospital, a nursing or convalescent home or other health care facility.

63 P.S. § 425.2 (emphasis added). An HMO is not expressly included in this definition of a professional health care provider. Accordingly, we must delve deeper to determine whether an HMO, specifically an IPA model HMO, is an entity which may be considered to be a "corporation or other organization operating a hospital . . . or other health care facility." 63 P.S. § 425.2.

In Pennsylvania, health maintenance organizations ("HMOs") are governed by the Health Maintenance Organization Act (the "HMO Act"). Act of December 29, 1972, P.L. 1701, No. 364, § 1, *as amended,* 40 P.S. § 1551 *et seq.* The stated purpose of the HMO Act is "to permit and encourage the formation and regulation of [HMO's] and to authorize the Secretary of Health to provide technical advice and assistance to corporations desiring to establish, operate and maintain a [HMO]. . . ." 40 P.S. § 1552. The HMO Act defines a HMO as "an organized system which combines the delivery and financing of health care and which provides basic **health**

**services** to voluntarily enrolled subscribers for a fixed prepaid fee." 40 P.S. § 1553 (emphasis added). These "health services" may be provided either through physicians who are directly employed by the HMO, or through one or more groups of physicians. *See* 40 P.S. § 1554.

We recognize that organizations grouped together under the rubric of "HMOs" vary widely in terms of the degree to which they act as direct health care providers, and, conversely, the degree to which they act as traditional insurers. Generally, there are three models of HMOs: Staff; Independent Practice Associations ("IPA"); and Group models. Gregory G. Binford, *Malpractice and the Prepaid Health Care Organization*, 3 Whittier L.Rev. 337, 338 (1981). The models can be distinguished by examining the relationship between the HMO and its participating physicians, and the way in which the HMO finances its program. Tayebe Shah–Mirany, *Malpractice Liability of Health Maintenance Organizations: Evolving Contract and Tort Theories*, 39(3) Med.Trial Tech.Q. 357, 358–59 (1993).

The Pennsylvania Code defines the various types of HMOs. A Staff model HMO is an HMO "that delivers services through its own physicians who are paid employees (staff) of the HMO." 28 Pa.Code § 9.2. The subscribers of these Staff model HMO plans, therefore, receive their health care from a group of doctors working together for a salary at the plan's facility and at hospitals chosen by the plan. In short, a Staff model HMO either owns or leases its own facilities, in which it operates and oversees the administration of primary care services. In addition, the Staff model HMO employs its own salaried physicians and other salaried health care providers.

A Group model HMO involves contractual relationships between the HMO and physician groups. These physician groups or providers may treat the plan subscribers exclusively, or treat plan subscribers in addition to fee-for-service patients. Since each physician group or provider is selected by the HMO's administrative body as a participant in the HMO, the plan members have a limited choice of physicians within the group. *Id.*

The final type of HMO is the IPA model HMO. The IPA model HMO is an HMO "that contracts for delivery of services with a partnership, corporation, or association whose major objective is to enter into contractual arrangements with health professionals for the delivery of such health services." 28 Pa.Code § 9.2. In this model, therefore, the HMO contracts with an IPA, a pre-existing partnership or corporation of physicians, who then provides the health care for participating members. The typical arrangement in the IPA model HMO is that its physicians usually work in their own offices, use their own equipment, and keep their own records. The HMO pays the IPA a specified amount per subscriber, called a "capitation." [3] The IPA then pays the physician on a fee-for-service basis.

It is not disputed that HMO PA is an IPA model HMO. In fact, HMO PA's Group Master Contract provides that it is an IPA model HMO and defines an "IPA" as "a Pennsylvania Corporation, which has entered into a written agreement for the provision of those health care benefits and services **to be rendered** to Members hereunder by health professionals other than those under contract directly to HMO[ ]PA." The Group Master Contract also defines who and what is considered a health care provider. A "[p]rovider" means a [p]hysician, [h]ospital, [s]killed [n]ursing [f]acility, or [h]ome [h]ealth [a]gency." Nowhere in the Group Master Contract does HMO PA designate itself or hold itself out to be a "provider" of professional health care services.

It is this court's opinion that entities such as Staff or Group model HMO's may be considered "health care providers" under the PRPA in an appropriate case. Not so clear, however, is whether IPA model HMOs, like HMO PA, that do not operate their own facilities, but merely act as insurers or quasi-insurers, should be covered by the PRPA.

**3.** A "capitation" is an actuarially determined amount prepaid by a HMO to the primary physician for each patient who has chosen that physician to provide professional health care services. *See Boyd v. Albert Einstein Medical Center,* 377 Pa.Super. 609, 619, 547 A.2d 1229, 1234 (1988).

■ Conceding that the purpose of the PRPA is to increase the quality of public health care by providing immunity to quality assurance review proceedings, the General Assembly has achieved this purpose only to the extent it provides immunity to individuals or groups enumerated in the statute. This court will not read into the PRPA medical institutions or groups—Staff, Group, or IPA model HMOs, etc.—that are not specifically identified by the legislature. As such, we will not construe the statute to extend protection or confidentiality to HMO PA in this case. If HMO PA desires coverage by the PRPA, it should direct its arguments to the General Assembly.

Order reversed and case remanded.[4] Jurisdiction relinquished.

---

4. Because we reverse and remand this case to the trial court for further proceedings, we need not address Appellants' second issue.