J-A04009-15
J-A04010-15

2015 PA Super 132

| | | |
|---|---|---|
| MICHAEL J. YOCABET, | | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | | |
| v. | | |
| UPMC PRESBYTERIAN AND UNIVERSITY OF PITTSBURGH PHYSICIANS, | | |
| APPEAL OF: UPMC PRESBYTERIAN SHADYSIDE, | | |
| Appellant | | |

| | | |
|---|---|---|
| CHRISTINA L. MECANNIC, | | |
| Appellee | | |
| v. | | |
| UPMC PRESBYTERIAN AND UNIVERSITY OF PITTSBURGH PHYSICIANS, | | |
| APPEAL OF: UPMC PRESBYTERIAN SHADYSIDE, | | |
| Appellant | | No. 569 WDA 2014 |

Appeal from the Order March 11, 2014
In the Court of Common Pleas of Allegheny  County
Civil Division at No(s): G.D. NO. 11-19112, G.D. NO. 11-19113

| | | |
|---|---|---|
| MICHAEL J. YOCABET, | | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | | |
| v. | | |

J-A04009-15
J-A04010-15

UPMC PRESBYTERIAN AND UNIVERSITY
OF PITTSBURGH PHYSICIANS,

APPEAL OF: UPMC PRESBYTERIAN
SHADYSIDE,

                Appellant

_____

CHRISTINA L. MECANNIC,

                Appellee

          v.

UPMC PRESBYTERIAN AND UNIVERSITY
OF PITTSBURGH PHYSICIANS,

APPEAL OF: UPMC PRESBYTERIAN
SHADYSIDE,

                Appellant       No. 1230 WDA 2014

Appeal from the Order June 26, 2014
In the Court of Common Pleas of Allegheny County
Civil Division at No(s): G.D. NO. 11-19112, G.D. NO. 11-19113

BEFORE:  BOWES, OLSON, and STRASSBURGER,[*] JJ.

OPINION BY BOWES, J.:             **FILED JUNE 5, 2015**

_____

[*]  Retired Senior Judge assigned to the Superior Court.

- 2 -

UPMC Presbyterian Shadyside ("UPMC") has filed these two appeals from pretrial discovery orders. Since the orders involve common issues of fact and law, we have consolidated them for disposition. UPMC maintains that both orders, one dated March 11, 2014, and the other one dated June 26, 2014, require it to produce materials that are confidential under the Peer Review Protection Act, 63 P.S. §§ 425.1-425.4 (the "Peer Review Act" or "Act"). We will generally refer to this privilege as the peer review privilege. UPMC also invokes the attorney-client privilege as to the materials ruled discoverable in the June 26, 2014 order.[1] We affirm the March 11, 2014

_____

[1] We conclude that we have jurisdiction herein, even though the orders in question are non-final. When a party is ordered to produce materials purportedly subject to a privilege, we have jurisdiction under Pa.R.A.P. 313, which outlines the collateral order doctrine. Pa.R.A.P. 313(b) ("A collateral order is an order separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost."); *see Dodson v. DeLeo*, 872 A.2d 1237 (Pa.Super. 2005) (where trial court ordered party to produce materials allegedly protected by the Peer Review Protection Act, order was collateral order); *Law Office of Douglas T. Harris, Esquire v. Philadelphia Waterfront Partners, LP*, 957 A.2d 1223 (Pa.Super. 2008) (Pursuant to Pa.R.A.P. 313, where appealing party makes colorable claim that attorney-client privilege applies, we will review merits of order requiring disclosure). In *Ben v. Schwartz*, 729 A.2d 547 (Pa. 1999), our Supreme Court ruled that orders refusing to apply a claimed privilege were immediately appealable as collateral orders. In *Commonwealth v. Harris*, 32 A.3d 243, 252 (Pa. 2011), our Supreme Court re-affirmed that "orders overruling claims of privilege and requiring disclosure are immediately appealable under Pa.R.A.P. 313" despite the United States Supreme Court's decision in *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100 (2009),

*(Footnote Continued Next Page)*

order. We reverse the June 26, 2014 order and remand for the conduct of *in camera* review in order to determine whether either privilege invoked by UPMC applies to the materials involved therein.

These appeals stem from two civil cases involving allegations of, *inter alia*, medical malpractice. At lower court docket number GD 11-19112, Michael J. Yocabet instituted a lawsuit against UPMC and University of Pittsburgh Physicians, and at lower court docket number GD 11-19113, Christina L. Mecannic filed a civil action against the same entities. The two lawsuits pertain to the same event, a kidney transplant. We summarize the allegations contained in the complaints. Mr. Yocabet was on the kidney transplant waiting list at UPMC awaiting a new kidney due to damage to that organ caused by his Type I diabetes. Ms. Mecannic was Mr. Yocabet's significant other and the mother of his son. Ms. Mecannic volunteered to undergo the necessary testing to determine if her eligibility to be a kidney donor for Mr. Yocabet.

Mr. Yocabet did not have Hepatitis C prior to the kidney transplant surgery. On January 26, 2011, Ms. Mecannic underwent blood test

*(Footnote Continued)* ─────────────────

which disallows such appeals in the federal system. ***See also Commonwealth v. Williams***, 86 A.3d 771 (Pa. 2014) (reviewing propriety of order from PCRA court compelling Commonwealth to produce materials that it contended were protected under work product doctrine); ***In re Thirty-Third Statewide Investigating Grand Jury***, 86 A.3d 204, 215 (Pa. 2014) (reviewing orders that purportedly violated attorney-client privilege and other statutory privileges).

screening, and that testing revealed that she had Hepatitis C. Having Hepatitis C renders a person ineligible to be a kidney donor under federal guidelines and UPMC policies. Follow-up testing was recommended, but none was ordered.

On January 26, 2011, Dr. Mark Sturdevant, a UPMC transplant surgeon, documented that he reviewed Ms. Meccanic's laboratory work, which would have included the positive results for Hepatitis C. He recommended her as an excellent kidney donor candidate. That same day, UPMC nephrologist Dr. Nirav Shah documented that he reviewed Ms. Meccanic's laboratory work. Dr. Shah indicated that she appeared to be a reasonable donor candidate. On January 31, 2011, UPMC physician Dr. Jennifer L. Steel reviewed Ms. Meccanic's records, which would have included the positive results for Hepatitis C. Dr. Steel approved Ms. Meccanic as a donor and found no contraindications for donation.

UPMC Transplant Selection Committee meetings were held on February 17, 2011, and March 23, 2011. Ms. Meccanic's qualifications and test results were discussed at those meetings, where she was approved as a donor. If anyone during these five review processes had noticed Ms. Meccanic's positive test for Hepatitis C, she would not have been approved as a kidney donor for Mr. Yocabet. In a March 24, 2011 letter to Ms. Meccanic, Mimi Funovitis, a nurse and UPMC's transplant coordinator, informed Ms. Meccanic

that, after a review of Ms. Meccnic's evaluation test results and interviews, Ms. Meccanic was medically approved to be a kidney donor.

On March 29, 2011, Ms. Mecannic underwent additional blood testing ordered by Dr. Henkie Tan. That testing also included a screening for Hepatitis C, and the results indicated that there was an insufficient quantity of blood to perform the ordered testing. Those results were faxed to Ms. Funovitis. Ms. Funovitis documented that Ms. Mecannic's blood had to be re-drawn, but UPMC did not secure more blood from Ms. Meccanic. On April 1, 2011, Dr. Tan, the lead surgeon on the transplant team, completed a form known as a transplant surgery consultation, wherein he noted Ms. Mecannic was a suitable candidate for donation.

One of Ms. Mecannic's kidneys was transplanted into Mr. Yocabet on April 6, 2011. At some unknown time after the surgery, UPMC personnel discovered that they had transplanted a Hepatitis C infected kidney into Mr. Yocabet. On April 22, 2011, UPMC obtained another blood sample from Ms. Meccanic without telling her the blood analysis was being performed solely to determine her level of Hepatitis C infection and was not standard donor testing following transplant surgery. On May 6, 2011, UPMC personnel informed Ms. Meccanic that she had Hepatitis C.

Mr. Yocabet subsequently contracted Hepatitis C from Ms. Mecannic's donated kidney. An infectious disease doctor informed Mr. Yocabet that the

Hepatitis C treatment would eventually result in kidney failure and death. Ms. Meccanic underwent surgery that should not have been performed and was left with one kidney.

After the complaints were filed, these two actions were consolidated at GD 11-019112 for purposes of discovery. The plaintiffs submitted interrogatories and a request for production of documents and then a motion to compel. Due to the complexity of the discovery issues, the matter was referred to a special master, Roslyn M. Litman, Esquire.

The following facts are pertinent to the issues involved in these appeals. After the transplant at issue occurred, the Pennsylvania Department of Health ("Department of Health"), on behalf of the Centers for Medicare and Medicaid Services, conducted an investigation of the UPMC transplant program ("CMS/DOH investigation"). The Centers for Medicare and Medicaid Services is a federal agency within the United States Department of Health and Human Services. It administers the Medicare and Medicaid insurance programs and collaborates with state governments to administer Medicaid, a social services program that provides health insurance for individuals and families with low income and limited financial resources. During discovery, the plaintiffs sought the communications, which consisted of documents and interviews, submitted by UPMC to the Department of Health for purposes of the CMS/DOH investigations. UPMC

claimed that the requested materials were confidential under the Peer Review Act.

The master opined that the documents and interviews submitted to the Department of Health were not confidential since it was not conducting peer review during the CMS/DOH investigation. UPMC filed objections to the master's conclusion that the plaintiffs could obtain the documents and interviews reviewed for purposes of the CMS/DOH investigation. In a March 11, 2014 order, the trial court affirmed the master's conclusion that the peer review privilege did not apply to the materials submitted by UPMC to the Department of Health during the CMS/DOH investigation. The appeal at 569 WDA 2014 followed. The issue raised therein is: "Whether documents and communications generated as a result of the CMS/DOH investigation of the medical treatment at issue are protected from discovery by the Pennsylvania Peer Review Protection Act (63 P.S. § 425.1 *et seq.*)?" Appellant's brief (569 WDA 2014) at 5.

The June 26, 2014 order on appeal at 1230 WDA 2014 concerns the following facts. The plaintiffs requested information about a May 11, 2011 meeting of the Board of Directors of UPMC ("May 11, 2011 Board meeting"). UPMC objected to that request and claimed that the information sought was shielded from discovery by both the Peer Review Act and the attorney-client privilege. The master recommended that the attorney-client privilege be

held applicable; concomitantly, she did not reach the peer review issue. The plaintiffs objected to this recommendation as well as a number of the master's other discovery conclusions.

On June 26, 2014, the plaintiffs' objections were granted in part, and the trial court, without reviewing the board minutes to determine whether a privilege applied, ordered UPMC to produce the information that the plaintiffs had requested about the May 11, 2011 Board meeting. The trial court concluded that the attorney-client privilege was inapplicable; it did not address whether the confidentiality provision outlined in the Peer Review Act applied. The appeal at 1230 WDA 2014 followed. The issues raised therein are:

> A. Whether the trial court erred in ruling that documents and other information regarding a board meeting following the incident at issue are not protected from discovery by the attorney-client privilege?

> B. Whether the trial court erred in ruling that documents and other information regarding a board meeting following the incident at issue are not protected from discovery by the peer review privilege?

Appellant's brief (1230 WDA 2014) at 5.

## I.     Standard and Scope of Review and Burden of proof

In these appeals, we are called upon to determine whether the Peer Review Act's confidentiality provision protects from discovery the materials sought with respect to the CMS/DOH investigation and the May 11, 2011

Board meeting. We thus engage in an interpretation of its provisions. Where "the issue is the proper interpretation of a statute, it poses a question of law; thus, our standard of review is *de novo,* and the scope of our review is plenary." **Phoenixville Hosp. v. Workers' Compensation Appeal Bd. (Shoap)**, 81 A.3d 830, 838 (Pa. 2013); **accord In re Thirty-Third Statewide Investigating Grand Jury**, 86 A.3d 204, 215 (Pa. 2014) (if an appellant invokes a statutory privilege, appellate review is plenary). We must review the applicability of the attorney-client privilege with regard to the May 11, 2011 Board meeting. "Whether the attorney-client privilege or the work product doctrine protects a communication from disclosure is a question of law." **In re Thirty-Third Statewide Investigating Grand Jury**, **supra** at 215. Thus, the same standards apply with respect to both privileges.

The "party invoking a privilege must initially set forth facts showing that the privilege has been properly invoked[.]" **Red Vision Systems, Inc. v. National Real Estate Information Services, L.P.**, 108 A.3d 54, 62 (Pa.Super. 2015) (attorney-client privilege); **accord In re T.B.**, 75 A.3d 485 (Pa.Super. 2013) (statutory privilege applicable to communications to psychiatrist and psychologists). Once the invoking party has made the appropriate proffer, then the burden shifts to the party seeking disclosure to set forth facts showing that disclosure should be compelled either because

the privilege has been waived or because an exception to the privilege applies. **Red Vision Systems, Inc.**, **supra**; **In re T.B.**, **supra**.

While there are no exceptions to the peer review privilege articulated in the case law thus far, in the attorney-client context, there are a number. The attorney-client privilege will not be upheld when the client has attacked the honesty or professionalism of the attorney, when the advice was sought for the purpose of committing a crime, and where nondisclosure would have the sole effect of frustrating the administration of justice. **Red Vision Systems, Inc.**, **supra**. Additionally, "if the private good of protection from the harm that could come with disclosure of attorney-client communications is not furthered by application of the privilege, it is inapplicable." **Id**. at 62. Thus, for purposes of these appeals, we must examine whether UPMC, as the party with the initial burden of proof, has presented sufficient facts to bring the asserted privilege into play.

## II.   Appeal 569 WDA 2004
### CMS/DOH Investigation: Peer Review Privilege

In this appeal, the claimed privilege is the one outlined in the Peer Review Act. Our primary focus in determining whether the peer review privilege applies is "directed to the plain language of the provisions" of the statute in question. **In re Thirty-Third Statewide Investigating Grand Jury**, **supra** at 215.

We have observed that the purpose of the Peer Review Act's confidentiality provision is to "to facilitate self-policing in the health care industry." *Dodson v. DeLeo*, 872 A.2d 1237, 1242 (Pa.Super. 2005). Since the Peer Review Act embodies the legislature's belief that the "medical profession itself is in the best position to police its own activities," the Peer Review Act is designed to encourage "comprehensive, honest, and potentially critical evaluations of medical professionals by their peers." *Id*. As we more specifically delineated in *Sanderson v. Frank S. Bryan, M.D., Ltd.*, 522 A.2d 1138, 1139 (Pa.Super. 1987):

> The medical profession exercises self-regulation. The most common form of such regulation in the health care industry is the peer review organization. Hospital peer review organizations are usually composed of physicians who review and evaluate other physicians' credentials and medical practices. Generally, hospital peer review findings and records are protected from public scrutiny either legislatively, or by court decision. The purpose for such protection is to encourage increased peer review activity which will result, it is hoped, in improved health care.

The report issued after the CMS/DOH investigation is publicly available. A review of the report reveals that the purpose of the CMS/DOH investigation was to determine if UPMC's kidney transplant program was in compliance with the requirements of the Centers for Medicare and Medicaid Services and thus eligible to continue to participate in the Medicare/Medicaid program. Exhibit 4, Master's Report and Recommendations Re Discovery Disputes Resulting from Plaintiff[s'] Motion to Compel, 10/22/13. The

Department of Health stated in its report that it conducted an "unannounced Medicare complaint survey" at UPMC on June 7 and June 8, 2011. *Id*. at 1. The Department of Health personnel met with the hospital's administrators and transplant program staff.

The report noted that a transplant center located within a hospital that has a Medicare provider agreement must meet "the conditions of participation specified in § 482.72 through § 482.104 in order to be granted approval from [the Centers for Medicare and Medicaid Services] to provide transplant services." *Id*. at 2. The report continued that, in addition to meeting those conditions, "a transplant center must also meet the conditions of participation specified in § 482.1 through § 482.57." *Id*.

The report stated, "Based on review of facility documents and interview with staff," the Department of Health concluded that the "Adult Kidney Only (AKO) program [at UPMC] failed to ensure that the facility met the conditions of participation specified in § 482.90 Patient and Living Donor Selection." *Id*. After finding multiple violations of § 482.90, the Department of Health outlined an eleven-page plan of correction and assigned responsibility for implementation of different aspects of the plan to different staff members employed by UPMC. The plan of correction was designed to bring UPMC into compliance with the conditions of participation specified in

the § 482.90 so that it could continue to receive payments under Medicare and Medicaid.

Hence, the report establishes that the purpose of the CMS/DOH investigation was to determine whether UPMC had complied with conditions and requirements to operate as a transplant center under applicable federal guidelines and whether its adult kidney transplant program could continue to participate in the Medicare and Medicaid programs.

We conclude the confidentiality provision of the Peer Review Act does not apply to the CMS/DOH investigation because the Department of Health is not a professional health care provider and thus did not conduct peer review. The peer review privilege provides that the "proceedings and records of a review committee shall be held in confidence[.]" 63 P.S. § 425.4.[2]  A review

_____

[2]  The complete statutory text is as follows:

> The proceedings and records of a review committee shall be held in confidence and shall not be subject to discovery or introduction into evidence in any civil action against a professional health care provider arising out of the matters which are the subject of evaluation and review by such committee and no person who was in attendance at a meeting of such committee shall be permitted or required to testify in any such civil action as to any evidence or other matters produced or presented during the proceedings of such committee or as to any findings, recommendations, evaluations, opinions or other actions of such committee or any members thereof: Provided, however, that information, documents or records otherwise available from original sources are not to be construed as immune from discovery or use in any such civil action merely

*(Footnote Continued Next Page)*

organization is identified in the Act as "any committee engaging in peer review[.]"  63 P.S. § 425.2.[3]  Peer review is defined as "a procedure for evaluation **by professional health care providers**" of the quality and

*(Footnote Continued)* ─────────────────

> because they were presented during proceedings of such committee, nor should any person who testifies before such committee or who is a member of such committee be prevented from testifying as to matters within his knowledge, but the said witness cannot be asked about his testimony before such a committee or opinions formed by him as a result of said committee hearings.

63 P.S. § 425.4.

[3] The full definition of "review organization" is

> any committee engaging in peer review, including a hospital utilization review committee, a hospital tissue committee, a health insurance review committee, a hospital plan corporation review committee, a professional health service plan review committee, a dental review committee, a physicians' advisory committee, a veterinary review committee, a nursing advisory committee, any committee established pursuant to the medical assistance program, and any committee established by one or more State or local professional societies, to gather and review information relating to the care and treatment of patients for the purposes of (i) evaluating and improving the quality of health care rendered; (ii) reducing morbidity or mortality; or (iii) establishing and enforcing guidelines designed to keep within reasonable bounds the cost of health care.  It shall also mean any hospital board, committee or individual reviewing the professional qualifications or activities of its medical staff or applicants for admission thereto. It shall also mean a committee of an association of professional health care providers reviewing the operation of hospitals, nursing homes, convalescent homes or other health care facilities.

63 P.S. § 425.2.

efficiency of services ordered or performed by other "professional health care providers." 63 P.S. § 425.2 (emphasis added).[4] Thus, peer review occurs only when one professional health care provider is evaluating another professional health care provider.

UPMC is a professional health care provider, as defined by the Peer Review Act, but neither the Pennsylvania Department of Health nor the Centers for Medicare and Medicaid Services is a professional health care provider. Since the Department of Health and the Centers for Medicare and Medicaid Services are not professional health care providers, the Department of Health did not engage in peer review during the CMS/DOH investigation.

---

[4] In full, "peer review"

> means the procedure for evaluation by professional health care providers of the quality and efficiency of services ordered or performed by other professional health care providers, including practice analysis, inpatient hospital and extended care facility utilization review, medical audit, ambulatory care review, claims review, and the compliance of a hospital, nursing home or convalescent home or other health care facility operated by a professional health care provider with the standards set by an association of health care providers and with applicable laws, rules and regulations. Peer review, as it applies to veterinarians, shall mean the procedure for evaluation by licensed doctors of veterinary medicine of the quality and efficiency of veterinary medicine ordered or performed by other doctors of veterinary medicine with the standards set by an association of doctors of veterinary medicine and with applicable laws, rules and regulations.

63 P.S. § 425.2.

Thus, the records tendered by UPMC for purposes of the CMS/DOH investigation are not, by the clear and unequivocal terms of the Peer Review Act, subject to the peer review privilege. Our analysis follows.

The Peer Review Act sets forth that a "professional health care provider"

means individuals or organizations who are approved, licensed, or otherwise regulated to practice or operate in the health care field under the law of the Commonwealth, including, but not limited to, the following individuals or organizations:

(1) A physician.

(2) A dentist.

(3) A podiatrist.

(4) A chiropractor.

(5) An optometrist.

(6) A psychologist.

(7) A pharmacist.

(8) A registered or practical nurse.

(9) A physical therapist.

(10) An administrator of a hospital, a nursing or convalescent home, or other health care facility.

(11) A corporation or other organization operating a hospital, a nursing or convalescent home or other health care facilit*y.*

63 P.S. § 425.2.

The Department of Health and the Centers for Medicare and Medicaid Services are not organizations approved, licensed, or otherwise regulated to practice or operate in the health care field. Neither the Department of Health nor the Centers for Medicare and Medicaid Services falls within any of the enumerated eleven categories defining a professional health care provider. Instead, the Department of Health is a state agency. Its "mission is to promote healthy lifestyles, prevent injury and disease, and to assure the safe delivery of quality health care for all Commonwealth citizens." http://www.health.pa.gov. The Department of Health does not itself provide health care to people.

*McClellan v. Health Maintenance Organization*, 660 A.2d 97 (Pa.Super. 1995), *aff'd by an equally divided court*, 686 A.2d 801 (Pa. 1996), is dispositive. In that case, the plaintiffs brought personal injury lawsuits against a doctor and a health maintenance organization ("HMO") after the doctor failed to biopsy a malignant mole removed from plaintiffs' decedent. The HMO was alleged to have engaged in corporate negligence due to its failure to retain responsible doctors and to review its doctors to ensure that the doctors provided competent health care. After the plaintiffs filed a request for production of documents, the HMO claimed that those items were subject to the peer review privilege. The trial court compelled the HMO to produce the materials, and the HMO appealed. We concluded

that the privilege did not apply because the HMO in question was not a professional health care provider as defined in the Peer Review Act.

We delineated the following in **McClellan**. The structure of any HMO, which provides both health insurance and health care, can widely vary, and the diverse models change the degree to which the HMO acts as a direct health care provider. A staff-model HMO provides health care services through its own doctors and other health care professionals who are paid employees. A staff-model HMO also owns or leases its own facilities, and operates and oversees the administration of primary care services. A group-model HMO involves contractual relationships between the HMO and physician groups.

An independent practice association HMO "contracts for delivery of services with a partnership, corporation, or association whose major objective is to enter into contractual arrangements with health professionals for the delivery of such health services." **Id**. at 101 (citation omitted). Those physicians contracting with this model of HMO typically practice in their own office, own their own equipment and records, and are paid by the HMO a fee for services rendered. Those types of HMOs largely operate as providers of health insurance.

The HMO at issue was an independent practice association HMO, and we concluded that the HMO was not a professional health care provider

because it did not practice or operate in the health care field and was not included within the eleven categories of people and organizations defined as professional health care providers in the Peer Review Act. We refused to read into the Peer Review Act's definition of professional health care provider any "medical institutions or groups . . . that are not specifically identified by the legislature." *Id*. at 102. Likewise, herein, the Department of Health does not provide health care.

UPMC attempts to convert the Department of Health into a professional health care provider by asserting that the Department of Health personnel involved in the investigation were doctors and nurses, who are defined as professional health care providers in the Peer Review Act. We hold that an entity that is not itself a professional health care provider does not become one merely because it hires a professional health care provider to conduct its investigation.

The Department of Health is a fictitious entity that can only operate through its agents and employees.[5] The qualifications of a person hired by the Department of Health does not alter either what it does or its purposes. We find *Piroli v. Lodico*, 909 A.2d 846 (Pa.Super. 2006), instructive. Therein, a billing manager was present during a peer review proceeding conducted by a professional health care provider of a doctor credentialed at

_____

[5] This legal precept is discussed in more detail in the text *infra*.

- 20 -

its facility. We concluded that the "mere fact that the billing manager was present, in addition to the health care professionals" on a committee conducting peer review under the Peer Review Act, did "not serve to eviscerate the protections that the legislature intended the [Peer Review Act] to provide." *Id*. at 852. We thus held that the peer review proceedings remained confidential despite the fact that review occurred in the presence of a person who was not a professional health care provider as defined in the Peer Review Act. Conversely, in this case, the Department of Health did not become a professional health care provider for purposes of the Peer Review Act by virtue of the fact that it hired doctors and nurses to conduct its investigation.

Additionally, providing confidentiality herein would not advance the purpose of the Peer Review Act, which is designed "to facilitate self-policing in the health care industry." *Dodson*, *supra* at 1242. This review was conducted by a state agency on behalf of a federal agency and did not, to any extent, involve self-policing by the health care industry.

UPMC was not, by participating in the investigation, policing its own activities nor was any medical professional doing so. Instead, UPMC was reporting to a governmental body so that it could retain the right to receive payment from programs covering a group of its patients. UPMC personnel were aware that their interviews were being conducted by a governmental

oversight organization and that UPMC's status as an approved transplant center for purposes of Medicare/Medicaid was in jeopardy. Thus, application of the peer review privilege to the CMS/DOH investigation does not advance the impetus behind the Act's enactment.

UPMC insists, however, that there is another public policy reason for upholding the peer review privilege. Appellant's brief (569 WDA 2014) at 27. Rather than examine the rationale behind the Peer Review Act, which is the law implicated herein, UPMC invokes the Right-To-Know Law. 65 P.S. §§ 67.701, *et seq*. UPMC suggests that "the Department of Health documents" would be exempt from public access under that statute. ***Id***.

The Right-to-Know Law is completely irrelevant in this matter. The plaintiffs are not requesting anything from the Department of Health. As the plaintiffs aptly observe, they have "requested documents in UPMC's possession, directly from UPMC in a lawsuit against UPMC." Appellees' brief (569 WDA 2014) at 18. This case does not involve a member of the public who is requesting items from the Department of Health pursuant to a statute granting public access to records in the possession of a "Commonwealth agency, a local agency, a judicial agency or a legislative agency." 65 P.S. § 67.701.

The plaintiffs seek materials submitted to the Department of Health by UPMC for purposes of the CMS/DOH investigation rather than anything

generated by the Department of Health. UPMC has insisted that it does not have to reveal any materials that it tendered to the Department of Health because those items are protected by the peer review privilege. The privilege is not validly invoked with respect to materials that UPMC tendered to the Department of Health because the Department of Health did not conduct peer review as defined in the Act.

UPMC also points out that peer review can apply to investigations performed "by outside entities." Appellant's brief (569 WDA 2014) at 14. We agree with this proposition. However, under the unequivocal language of the Peer Review Act, peer review can be initiated only by a professional health care provider. An external committee formed or retained by a professional health care provider to conduct peer review and composed of professional health care providers outside its employ would qualify as a review organization. However, the Department of Health is not a professional health care provider; consequently, any committee formed by it cannot be a review committee.

In conclusion, a review committee must be "engaging in peer review," and peer review is a "procedure for evaluation by professional health care providers" of services performed by other professional health care providers. 63 P.S. § 425.2. The Pennsylvania Department of Health, acting on behalf of the Centers for Medicare and Medicaid Services, did not, during the

CMS/DOH investigation conduct peer review because it is not a professional health care provider.[6]  Hence, the documents and interviews submitted by UPMC for purposes of the CMS/DOH investigation are not protected by the peer review privilege.

UPMC's insistence that it does not have to provide any materials given to the Department of Health for purposes of the CMS/DOH investigation is flawed for a second reason.  UPMC has invoked peer-review-privilege protection for any document or record that it submitted to the Department of Health during the CMS/DOH investigation.  At oral argument, UPMC represented that even an incident report would be confidential if used in connection with a peer review process.  This position is contrary to the terms of the confidentiality provision of the Peer Review Act and applicable law.

The Peer Review Act provides in pertinent part that "proceedings and records of a review committee shall be held in confidence and shall not be subject to discovery."  63 P.S. § 425.4.  It continues that "information, documents or records otherwise available from original sources are not to be

_____

[6] In asserting that the peer review privilege applies herein, UPMC relies upon a three-paragraph decision in **Bush v. Wright**, 222 A.D.2d 546, 635 N.Y.S.2d 87 (N.Y.A.D. 1995), wherein the Court held that the state department of health's investigation of a hospital incident was confidential under a New York statute.  UPMC, however, fails to analyze the New York statute involved therein and does not establish that it contains provisions analogous to those in the Act.

construed as immune from discovery or use in any such civil action merely because they were presented during proceedings of such committee[.]" *Id*.

In *Dodson*, *supra* at 1242, we specifically held that the Peer Review Act does not "protect non-peer review business records, even if those records eventually are used by a peer review committee." Thus, an incident report is not protected by the peer review privilege, even when such reports are reviewed by a peer review organization *Atkins v. Pottstown Memorial Med. Center*, 634 A.2d 258 (Pa.Super. 1993). As we observed in that case,

> After careful review of the purposes to be achieved by the statute, we conclude that the trial court erred when it excluded evidence of the incident report. This document contained information "otherwise available from original sources." It was not derived from nor part of an evaluation or review by a peer review committee. It was, rather, a report of an incident based on information also available to plaintiffs. As such, the report did not come within the need for confidentiality which the statute was intended to provide.

*Id*. at 260.

Accordingly, we reject UPMC's assertion that a record or document automatically is covered by the peer review privilege merely because it was forwarded to a peer review committee. The Department of Health report indicates that its findings were premised upon facility policies and documents, medical records, and staff interviews. Since, in this appeal, UPMC does not assert that any of the materials that UPMC submitted to the

Department of Health were generated as a result of an internal peer review process, we affirm the trial court's refusal to apply UPMC's blanket assertion of confidentiality to the materials that UPMC gave to the Department of Health for purposes of the CMS/DOH investigation. For the foregoing reasons, we find that UPMC has not properly invoked the peer review privilege, and we affirm the March 11, 2014 order.

### III. Appeal at 1230 WDA 2014:
### May 11, 2011 Board meeting

This appeal concerns two interrogatories disseminated to UPMC by the plaintiffs wherein they sought the production of documents, communications and other information relating to the May 11, 2011 Board meeting, as follows:

23. Regarding a UPMC board meeting on May 11, 2011, please: (a) produce any board minutes relating to this incident and/or any investigation of the transplant program in 2011; (b) identify and produce any documents provided to the board relating to this incident; (c) state whether it is admitted that Elizabeth Concordia mentioned that the test result for hepatitis C was missed by two people on the transplant team during a dozen steps in the process; (d) describe what Ms. Concordia told the board; and (e) identify the individuals present for the May 11, 2011 board meeting.

24. It is admitted that - during a board meeting on May 11, 2011 – Elizabeth Concordia described this incident as a "systematic" problem in the way protocols failed? If so: (a) describe what Ms. Concordia was referring to as a systematic problem; (b) identify and produce the protocols that Ms. Concordia was referring to; and (c) identify the individuals and/or documents that Ms. Concordia got her information from regarding this incident prior to briefing the board.

Plaintiff's First Set of Interrogatories and Request for Production of Documents Directed to Defendant UPMC Presbyterian, 12/16/11, at interrogatories ## 23-24.

UPMC claimed the peer review privilege and the attorney-client privilege applied to all of the information sought in these requests. In support of the peer review privilege, UPMC maintained the following. The transplant program and the incident at issue were discussed at this meeting. The Board of Directors of UPMC also examined the activities of the transplant program and the specifics of the kidney transplant at issue herein, including the donor review process, and corrective actions to be taken in the transplant program. Answers to Plaintiff's First Set of Interrogatories and Request for Production of Documents Directed to Defendant UPMC Presbyterian (Revised), 11/5/12, at answers ## 23-24.

UPMC also invoked the attorney-client privilege based on its averment that one or more attorneys were present at the meeting so that the Board could obtain legal advice. UPMC continued that some communications at the May 11, 2011 Board meeting involved the kidney transplant program, the kidney donation herein, and were made for purposes of securing legal counsel from the attorney or attorneys. *Id*.

The master recommended acceptance of UPMC's position that the attorney-client privilege applied to plaintiffs' interrogatories 23 and 24. The

trial court disagreed. It noted that the record indicated that, at the May 11, 2011 Board meeting, Elizabeth Concordia, UPMC's Executive Vice-President, presented information to the Board about the incident and that there was no claim that she is a lawyer. The trial court concluded that "nothing in the record . . . would permit a finding that Ms. Concordia's presentation with the Board of Directors was a discussion with legal counsel." Trial Court Opinion, 9/25/14, at 5. It characterized the "apparent purpose of the May 11, 2011 Board meeting" as one convened to "receive information from a high ranking corporate officer, who is not an attorney, in order for the Board to fulfill its responsibilities." *Id*.

The court continued, "If the Board was seeking legal advice from counsel, counsel would have met privately with Ms. Concordia and considered the information received in rendering a legal opinion" and that even if "a lawyer for UPMC was present and offered legal advice, a non-lawyer's presentation to the Board of Directors meets none of the requirements for an attorney-client relationship." *Id*. It ordered that UPMC divulge all of the materials outlined in interrogatories 23 and 24.

We first conclude that the attorney-client privilege can apply to a meeting of the governing board of an organization with its executive vice-president and that the attorney-client privilege potentially applies to the information requested in these interrogatories. We also find that a board of

directors of a professional health care provider can conduct peer review.  We remand for UPMC to produce for *in camera* review the information requested in interrogatories 23 and 24 so that it can be determined to what extent either asserted privilege applies to any of the requested information.

The attorney-client privilege is derived from the common law, ***In re Thirty-Third Statewide Investigating Grand Jury***, ***supra***, but is also codified at 42 Pa.C.S. § 5928, which states: "In a civil matter counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client."  As we observed in ***In re Thirty-Third Statewide Investigating Grand Jury***, ***supra***, "The attorney-client privilege is intended to foster candid communications between counsel and client, so that counsel may provide legal advice based upon the most complete information from the client." ***Id***. at 216.  Since the purpose of the attorney-client privilege "is to create an atmosphere that will encourage confidence and dialogue between attorney and client, the privilege is founded upon a policy extrinsic to the protection of the fact-finding process." ***Id***. at 216-17.  The actual beneficiary of this policy is not only the client but also the justice system, which "depends on frank and open client-attorney communication." ***Id***. at 217.

For a party to invoke the privilege, the following elements must be established:

> 1) The asserted holder of the privilege is or sought to become a client.
>
> 2) The person to whom the communication was made is a member of the bar of a court, or his subordinate.
>
> 3) The communication relates to a fact of which the attorney was informed by his client, without the presence of strangers, for the purpose of securing either an opinion of law, legal services or assistance in a legal matter, and not for the purpose of committing a crime or tort.
>
> 4) The privilege has been claimed and is not waived by the client.

*Red Vision Systems, Inc.*, *supra* at 62-63 (citation omitted). Additionally, when "the client is a corporation, the privilege extends to communications between its attorney and agents or employees authorized to act on the corporation's behalf." *Id*. at 60 (citation omitted).

Initially, we note that UPMC facially invoked this privilege in its answers to interrogatories. While the trial court speculated that Ms. Concordia's presentation was merely to apprise the Board of the situation, UPMC indicated the contrary in its answers to the two interrogatories. It asserted that the Board meeting was called in part to review what happened and seek legal advice. Although it did not identify the individuals by name, UPMC maintained that a lawyer or lawyers were present. Given the gravity of the situation and the inevitable filing of a lawsuit by Mr. Yocobet and Ms.

Meccanic, it is reasonable and appropriate that the UPMC Board was eliciting legal advice from its lawyers.

We reject the postulation that a corporate entity can obtain legal advice only when one of its high-ranking officials meets privately with counsel for advice on behalf of the corporation. As we noted in ***Petrina v. Allied Glove Corp.***, 46 A.3d 795, 799 (Pa.Super. 2012) (citations omitted; emphasis added),

> A corporation is a creature of legal fiction, which can act or "speak" only through its officers, **directors**, or other agents. Where a representative for a corporation acts within the scope of his or her employment or agency, the representative and the corporation are one and the same entity, and the acts performed are binding on the corporate principal.

Thus, the board of directors of a corporation, in addition to its officers, can act on its behalf for purposes of application of the attorney-client privilege.

During the May 11, 2011 Board meeting, Ms. Concordia, a high ranking official at UPMC, was discussing the kidney donor program and this kidney transplant with its governing board. Since the meeting may well have been called to seek legal advice from the lawyers present, it was improper to reject outright the privilege without examination of the factual basis for application of the privilege. The fact that Ms. Concordia was communicating by making a presentation is of no consequence since in Pennsylvania, "the attorney-client privilege operates in a two-way fashion to protect confidential client-to-attorney or attorney-to-client communications

made for the purpose of obtaining or providing professional legal advice."

***Gillard v. AIG Ins. Co.***, 15 A.3d 44, 59 (Pa. 2011).

Additionally, we find that UPMC facially invoked the peer review privilege. As noted earlier, peer review consists of a "procedure for evaluation by professional health care providers of the quality and efficiency of services ordered or performed by other professional health care providers." 63 P.S. § 425.2. UPMC is a professional health care provider. ***Id***. (a professional heath care provider includes "a corporation or other organization operating a hospital[.]"). ***Id***. A review organization includes "any hospital board, committee or individual reviewing the professional . . . activities of its medical staff[.]" During its May 11, 2011 meeting, the Board may have been engaging in peer review. UPMC, in its objections to interrogatories 23 and 24, made the appropriate proffer as to the applicability of the peer review privilege.

Thus, we conclude that UPMC was improperly ordered to reveal to the plaintiffs all of the information sought in the two interrogatories. Rather, *in camera* review[7] of the minutes of the meeting, the information disseminated

_____

[7] The plaintiffs claim that UPMC has refused to submit documents to *in camera* review for purposes of determining whether a privilege prevents their dissemination to plaintiffs. Specifically, they assert:

> What is most interesting is that when the Special Master indicated that she may review [certain] documents *in camera*,

*(Footnote Continued Next Page)*

by Ms. Concordia, and any documents[8] submitted to the meeting attendees is warranted.

In **T.M. v. Elwyn, Inc.**, 950 A.2d 1050 (Pa.Super. 2008), Elwyn, the appellant, asserted that a broadly-worded discovery order required it to reveal documents protected by the attorney-client privilege and the attorney work product doctrine and that the discovery order should have provided for the exclusion of documents encompassed by either of the two privileges. We noted that we could not determine, based upon the record, whether and to what extent either privilege applied to the items ruled discoverable in the order on appeal, and we reversed the discovery order. Significant herein is

*(Footnote Continued)* ─────────────

UPMC threatened an immediate appeal. In any event, Plaintiffs have a good-faith basis to believe that UPMC's narrative - that this was a single isolated event — would be proven patently false if UPMC ever has to produce any meaningful discovery documents or information. To date, since UPMC has not produced any of the requested documents, Plaintiffs are left with nothing but UPMC's narrative and no way to substantively challenge the same.

Appellees' brief at 15 (appeal No. 1230 WDA 2014).

**T.M. v. Elwyn, Inc.**, 950 A.2d 1050 (Pa.Super. 2008), as discussed in the text, provides that *in camera* review is to be undertaken if such review is needed to determine if a privilege is applicable to an item requested in discovery. We remind UPMC that the case law mandates *in camera* review, in appropriate circumstances, of items in a privilege log.

[8] We refer to our discussion in the body of the text *supra* as to the types of documents that have confidentiality for purposes of the Act. Documents submitted at the May 11, 2011 Board meeting would not automatically be privileged simply due to their submission to a peer review process.

the fact that we concluded that Elwyn had to create a privilege log and that the trial court had to issue a ruling as to the discoverability of each document placed in the log and sought by the opposing party.

We reminded Elwyn that, "as the party invoking these privileges, it must initially set forth facts showing that the privilege has been properly invoked" before the burden shifted to the party asking for disclosure "to set forth facts showing that disclosure will not violate the attorney-client privilege, e.g., because the privilege has been waived or because some exception applies." *Id*. at 1063 (citation and quotation marks omitted). We continued that if, "upon remand, Elwyn is able to identify certain materials encompassed in the discovery request that are subject to the attorney-client privilege or work product doctrine, then the trial court will be able to assess whether those materials are discoverable." *Id*. We remanded with the notation that "the court may conduct *in camera* review of documents identified by Elwyn to be subject to a privilege, to better analyze the privilege issues, as needed." *Id*.; **see also Gocial v. Independence Blue Cross**, 827 A.2d 1216, 1223 (Pa.Super. 2003) (trial court improperly required disclosure of all materials contained in a privilege log; trial court had to "rule on the relevance of each item or explain why the privileges raised were inapplicable;" in "some instances, *in camera* review may be required").

As it applies to the present case, *T.M.* provides that, since UPMC raised the appropriate allegations that the attorney-client privilege and/or peer review privilege potentially applied, the trial court could not require disclosure without examining the requested documents *in camera* to determine whether and to what extent the privileges applied to interrogatories numbered 23 and 24. We direct the creation of a privilege log, as mandated by *T.M.* and any documents identified on said log must be reviewed *in camera* by either the trial court or the master to determine whether those materials are discoverable. Thus, at appeal number 1230 WDA 2014, the June 26, 2014 order is reversed and the matter is remanded for proceedings consistent with this decision.

At 569 WDA 2014, the March 11, 2014 order is affirmed. At 1230 WDA 2014, the June 26, 2014 order is reversed. Case remanded. Jurisdiction relinquished.

Judge Olson joins the opinion.

Judge Strassburger files a concurring and dissenting opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/5/2015

- 35 -