J-A02016-16

J-A02017-16

2017 PA Super 247

| | |
|---|---|
| ESTATE OF JOSEPH PATERNO; AL CLEMENS, MEMBER OF THE BOARD OF TRUSTEES OF PENNSYLVANIA STATE UNIVERSITY, WILLIAM KENNEY, AND JOSEPH V. PATERNO JR.(JAY), FORMER FOOTBALL COACHES AT PENNSYLVANIA STATE UNIVERSITY | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (NCAA), MARK EMMERT, INDIVIDUALLY AND AS PRESIDENT OF NCAA, AND EDWARD RAY, INDIVIDUALLY AND AS FORMER CHAIRMAN OF THE EXECUTIVE COMMITTEE OF THE NCAA, AND PENNSYLVANIA STATE UNIVERSITY | |
| | No. 877 MDA 2015 |

APPEAL OF: PEPPER HAMILTON, LLP

Appeal from the Order Entered May 8, 2015
In the Court of Common Pleas of Centre County
Civil Division at No: No: 2013-2082

| | |
|---|---|
| GEORGE SCOTT PATERNO, AS DULY APPOINTED REPRESENTATIVE OF THE ESTATE AND FAMILY OF JOSEPH PATERNO; RYAN MCCOMBIE, ANTHONY LUBRANO, AL CLEMENS AND ADAM TALIAFERRO, MEMBERS OF THE BOARD OF TRUSTEES OF PENNSYLVANIA STATE UNIVERSITY; PETER BORDI, TERRY ENGELDER, SPENCER NILES, AND JOHN O'DONNELL, MEMBERS OF THE FACULTY OF PENNSYLVANIA STATE | IN THE SUPERIOR COURT OF PENNSYLVANIA |

J-A02016-16

J-A02017-16

UNIVERSITY; WILLIAM KENNEY AND JOSEPH V. ("JAY") PATERNO, FORMER FOOTBALL COACHES AT PENNSYLVANIA STATE UNIVERSITY; AND ANTHONY ADAMS, GERALD CADOGAN, SHAMAR FINNEY, JUSTIN KURPEIKIS, RICHARD GARDNER, JOSH GAINES,PATRICK MAUTI, ANWAR PHILLIPS AND MICHAEL ROBINSON, FORMER FOOTBALL PLAYERS OF PENNSYLVANIA STATE UNIVERSITY

Appellees

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (NCAA); MARK EMMERT, INDIVIDUALLY AND AS PRESIDENT OF THE NCAA; AND EDWARD RAY, INDIVIDUALLY AND AS FORMER CHAIRMAN OF THE EXECUTIVE COMMITTEE OF THE NCAA, AND THE PENNSYLVANIA STATE UNIVERSITY

Appellants                    No. 1709 MDA 2014

Appeal from the Order Entered September 11, 2014
In the Court of Common Pleas of Centre County
Civil Division at No: 2013-2082

THE ESTATE OF JOSEPH PATERNO; AL CLEMENS, MEMBER OF THE BOARD OF TRUSTEES OF PSU, AND WILLIAM KENNEY AND JOSEPH V. PATERNO, FORMER FOOTBALL COACHES AT PENNSYLVANIA STATE UNIVERSITY

IN THE SUPERIOR COURT OF PENNSYLVANIA

Appellees

v.

- 2 -

J-A02016-16

J-A02017-16

| | |
|---|---|
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (NCAA); MARK EMMERT, INDIVIDUALLY AND AS PRESIDENT OF THE NCAA; AND EDWARD RAY, INDIVIDUALLY AND AS FORMER CHAIRMAN OF THE EXECUTIVE COMMITTEE OF THE NCAA, AND THE PENNSYLVANIA STATE UNIVERSITY | |
| Appellants | No. 878 MDA 2015 |

Appeal from the Order Entered May 5, 2015
In the Court of Common Pleas of Centre County
Civil Division at No: 2013-2082

BEFORE:  PANELLA, STABILE, and DUBOW, JJ.

OPINION BY STABILE, J.:                    **FILED JULY 25, 2017**

These interlocutory appeals arise from orders directing production of documents over objections of attorney-client privilege and work product protection.  After careful review, we affirm in part, reverse in part, and remand for further proceedings.[1]

The questions before us pertain to work done by Freeh Sporkin & Sullivan, LLP ("FSS,")[2] on behalf of a Special Investigations Task Force (the "Task Force") created by The Pennsylvania State University ("Penn State"

---

[1]  Also pending is Appellants' application to discontinue, which we deny for reasons stated in the main text.

[2]  The FSS attorneys have since joined Pepper Hamilton.  The orders on appeal were directed to Pepper Hamilton.

- 3 -

and, collectively with FSS, Appellants). The Task Force comprises Penn State trustees, faculty, alumni, and students. Penn State created the Task Force to investigate its handling of the well-publicized scandal involving former assistant football coach Jerry Sandusky. On November 4, 2011, the Commonwealth of Pennsylvania charged Sandusky with committing serial sexual offenses against minor boys on Penn State's campus. A jury found Sandusky guilty on multiple counts and he is currently serving 30 to 60 years of incarceration.[3]

On July 12, 2012, FSS produced a report (the "Freeh Report") detailing its investigation of Penn State's handling of the Sandusky scandal. According to the Paterno parties[4] (collectively "Plaintiffs" or "Appellees"), the Freeh Report concluded that the late Joseph V. Paterno, former Penn State head football coach, was aware of allegations of Sandusky's conduct before Sandusky retired in 1999 but failed to take action to address that conduct.

_____

[3] The Commonwealth also filed charges against three high-ranking Penn State officials. A jury convicted Penn State President Graham B. Spanier of endangering the welfare of children (18 Pa.C.S.A. § 4304), Athletic Director Timothy M. Curley, and Senior Vice President for Finance and Business Gary C. Shultz, pled guilty to that offense. All three men were sentenced to terms of prison and house arrest on June 2, 2017.

[4] The Paterno parties are the estate of Joseph Paterno, Al Clemens, member of the Board of Trustees of Pennsylvania State University, William Kenney, and Joseph V. Paterno Jr.(Jay), former football coaches at Pennsylvania State University.

Plaintiffs' Second Amended Complaint, 10/13/14, at ¶ 67, 104. "According to the [Freeh Report], Penn State officials conspired to conceal critical facts relating to Sandusky's abuse from authorities, the [Penn State] Board of Trustees, the Penn State community, and the public at large. *Id.*

The National Collegiate Athletic Association ("NCAA"), defendant[5] in this action, adopted the Freeh Report in support of a consent decree whereby Penn State accepted the NCAA's imposition of sanctions for violations of the NCAA's constitution and bylaws. *Id.* at ¶¶ 88-89, 98. According to the consent decree:

> Head Football Coach Joseph V. Paterno failed to protect against a child sexual predator harming children for over a decade, concealed Sandusky's activities from the [Penn State] Board of Trustees, the University community and authorities, and allow[ed] [Sandusky] to have continued, unrestricted and unsupervised access to the University's facilities and affiliation with the University's prominent football program.

*Id.* at ¶ 104a (quoting the NCAA consent decree). Likewise, the consent decree provided that other coaches and staff "ignored red flags" of Sandusky's conduct. *Id.* at ¶ 104c (quoting the NCAA consent decree). Plaintiffs alleged that the NCAA "knew or should have known that the Freeh Report was an unreliable rush to judgment and that the conclusions reached in the report were unsupported. *Id.* at ¶ 90. Further, Plaintiffs alleged that

_____

[5] The named defendants include the NCAA, Mark Emmert, individually and as President of NCAA, and Edward Ray, individually and as former Chairman of the Executive Committee of the NCAA. We will refer to these parties collectively as the "NCAA."

the NCAA "also knew or should have known that by accepting the Freeh Report as a basis for imposing sanctions instead of following the NCAA's own rules and procedures […] they would dramatically increase the publicity given to its unreliable conclusions and effectively terminate the search for truth." *Id.*

Plaintiffs alleged various causes of action, including defamation, commercial disparagement, breach of contract, and interference with contractual relations. Shortly after filing suit, Plaintiffs served on FSS notice of intent to subpoena all of FSS's files relating to its preparation of the Freeh Report. FSS and Penn State (the latter having been added to this action as a nominal defendant), objected on grounds of attorney-client privilege and work product. On September 11, 2014, the trial court overruled most of the objections, thus requiring production of a large number of documents. On October 8, 2014, Appellants appealed from the September 11, 2014 order (captioned above at 1709 MDA 2014). Likewise, Appellants filed in the trial court motions for a stay pending appeal (*see* Pa.R.A.P. 1732(a)) and a protective order (*see* Pa.R.C.P. No. 4012). The trial court denied relief by order of November 20, 2014. This Court affirmed the denial of the stay.

On January 22, 2015, while the appeal at number 1709 was pending, Plaintiffs filed a motion in the trial court to enforce the subpoena. The trial court granted that motion on May 8, 2015. The trial court reasoned that it lacked jurisdiction to consider Appellants' claims of privilege and work

- 6 -

product, as those issues were before this Court in the appeal pending at number 1709. The trial court therefore enforced the subpoena without considering Appellants' objections. Appellants filed appeals from that order (captioned above at 877 and 878 MDA 2015). This Court denied Appellants' application for stay by order of June 19, 2015. Thus, FSS already has produced the documents at issue in this appeal. Should Appellants succeed in this appeal, documents will have to be returned to FSS and not used as evidence.

This case involves several million documents. Among those are approximately 3.5 million documents the parties refer to as "source documents," or documents that FSS gathered from Penn State's servers and records custodians. The parties generally agree that attorney-client privilege and work product doctrine do not prevent discovery of the source documents unless those documents divulge privileged communications. The second category, "non-source documents" comprises documents generated by FSS, such as notes and summaries of 430 interviews conducted by FSS attorneys and investigators from Freeh Group International Solutions, LLC ("FGIS") and other internal FSS memoranda. On April 26, 2014, this Court remanded this matter and requested further clarification of the documents at issue, including a privilege log identifying objections to specific documents or categories of documents. We also directed the parties to list and identify any documents ordered to be produced over Appellants' objections, grouping

such documents by category where practicable. Finally, we directed the trial

court to prepare an opinion explaining its reasons for overruling or granting

protection of documents.

Post-remand, the parties have significantly pared down the number of

documents still in dispute. In its opinion of August 12, 2016, the trial court

reasoned that the Task Force, not Penn State, was the client of FSS. Thus,

Penn State did not have standing to assert attorney-client privilege as to

communications between FSS and the Task Force. Trial Court Opinion,

8/12/16, at 3. Further, the trial court held that many of the non-source

documents were not discoverable because they were irrelevant to the

Plaintiffs' causes of action:

> The integral relevant issue in this case is whether Defendants adopted the allegedly false findings of the *Freeh Report* either with knowledge that the findings were false, or with reckless disregard of the findings' truth or falsity. […] When considering this issue in conjunction with FSS's attorney work product, the relevance of the work product to Plaintiffs' claims turns on whether FSS communicated or shared the work product with Defendants. Whether FSS acted with actual malice or reckless disregard for the truth in reaching the findings in the *Freeh Report* is wholly irrelevant to whether Defendants acted with said requisite state of mind. Therefore, any attorney work product which remained internal amongst the FSS team of attorneys is irrelevant to Plaintiffs' claims in this case and is not discoverable.

*Id.* at 8-9 (italics in original).

Finally, the trial court addressed summaries of the 430 interviews FSS

conducted. Present at each interview were the interviewee, an FSS

attorney, and an investigator from FGIS. The attorney and investigator each

took notes during the interview, and then prepared and then condensed their notes into an agreed upon interview summary. The trial court addressed summaries as follows:

> In the case at bar, several categories of the Privilege Log contain memoranda of interviews prepared by FSS interviewers. These memoranda contain a confluence of the statements made by the interviewees and the mental impressions, conclusions, and opinions of the interviewer. The attorney work product doctrine only applies to the interviewer's mental impressions, conclusions and opinions. Therefore, said memoranda are discoverable so long as the attorney work product portions are redacted.

*Id.* at 10-11.

In their post-remand supplemental brief, Appellants argue that the trial court erred in finding that Penn State was not a client of FSS. Appellants' Post-Remand Supplemental Brief at 9. Appellants also argue that the trial court erred in finding "non-transcribed, non-verbatim notes of hundreds of interviews prepared by [FSS] and members of its team, which undisputedly were not signed or otherwise adopted by the interviewees, are not protected from disclosure by the attorney work product doctrine[.]" *Id.* at 10. Appellees filed separate briefs responding to Appellants' arguments and raising their own challenge to the trial court's finding on relevancy. We will address these issues in turn.

First, Appellants challenge the trial court's finding that Penn State was not the client of FSS.[6] Whether attorney-client privilege protects a particular communication is a question of law. *In re Thirty-Third Statewide Investigating Grand Jury*, 86 A.3d 204, 215 (Pa. 2014). Our standard of review is *de novo* and our scope of review is plenary. *Custom Designs & Mfg. Co. v. Sherwin-Williams Co.*, 39 A.3d 372, 376 (Pa. Super. 2012). "In Pennsylvania, the attorney-client privilege operates in a two-way fashion to protect confidential client-to-attorney or attorney-to-client communications made for the purpose of obtaining or providing professional legal advice." *Id.* at 376.

_____

[6] Status as a client is the first of four elements that the proponent of the privilege claim must establish:

   1) The asserted holder of the privilege is or sought to become a client.

   2) The person to whom the communication was made is a member of the bar of a court, or his subordinate.

   3) The communication relates to a fact of which the attorney was informed by his client, without the presence of strangers, for the purpose of securing either an opinion of law, legal services or assistance in a legal matter, and not for the purpose of committing a crime or tort.

   4) The privilege has been claimed and is not waived by the client.

*Custom Designs*, 39 A.3d at 376.

The party asserting privilege bears the burden of producing facts establishing proper invocation of the privilege. *Yocabet v. UPMC Presbyterian*, 119 A.3d 1012, 1019 (Pa. Super. 2015). "Once the invoking party has made the appropriate proffer, then the burden shifts to the party seeking disclosure to set forth facts showing that disclosure should be compelled either because the privilege has been waived or because an exception to the privilege applies." *Id.* "Accordingly, [i]f the party asserting the privilege does not produce sufficient facts to show that the privilege was properly invoked, then the burden never shifts to the other party, and the communication is not protected under attorney-client privilege." *Custom Designs*, 39 A.3d at 376. The trial court determines whether the facts support the asserted privilege. *Law Office of Douglass T. Harris, Esq. v. Philadelphia Waterfront Partners, LP*, 957 A.2d 1223, 1231 (Pa. Super. 2008) (citing 8 Wigmore, Evidence, § 2322 (McNaughton rev. 1961)).

Appellants note that Penn State created the Task Force, and that the Task Force has no independent legal identity and no budget of its own. The chair of Penn State's board of trustees—not himself a member of the Task Force—signed the Engagement Letter on behalf of Penn State. Penn State paid for FSS's services, in accordance with the terms of the Engagement Letter. Appellants also rely on a December 22, 2011 letter from Penn State's in-house general counsel to FSS advising FSS that Penn State's president, trustees, and members of the Task Force were of the opinion that

FSS represented Penn State. Appellants also rely on a July 22, 2012 letter from Penn State's outside counsel to Freeh stating that FSS represented Penn State. In the July 22, 2012 letter, outside counsel described materials for which Penn State would and would not waive attorney-client privilege. For these reasons, Appellants assert that Penn State was the client.

Appellees counter that Freeh, in his deposition, testified that the Task Force was FSS's only client, and that FSS did not represent Penn State. Appellees also note that Penn State's general counsel, in her December 22, 2011 letter to FSS, referred to the Task Force as independent and distinct from Penn State and its board of trustees.

Both parties rely on the November 18, 2011 Engagement Letter ("Engagement Letter"), which outlines the terms of FSS's services. We will review that document in detail. The opening paragraph of that document states:

> We are pleased that the Board of Trustees of the Pennsylvania State University […] on behalf of the [Task Force] established by the Trustees […] has engaged us to represent the [Task Force]. […] Accordingly, this is to set forth **the basic terms upon which FSS has been engaged to represent the [Task Force]**, including the anticipated scope of our services and billing policies and practices that will apply to the engagement.

Engagement Letter, 11/18/11, at page 1 (emphasis added). Paragraph one, titled "Scope of Engagement," provides:

> **FSS has been engaged to serve as independent, external legal counsel to the [Task Force]** to perform an independent, full and complete investigation of the recently publicized allegations of sexual abuse at the facilities and the

alleged failure of [Penn State] personnel to report such sexual abuse to appropriate police and governmental authorities. The results of FSS's investigation will be provided in a written report to the [Task Force] and other parties as so directed by the [Task Force].

[…]

It is understood by FSS, the Trustees, and the [Task Force] that FSS will act under the sole discretion of the [Task Force].

[…]

It is also understood by FSS, the Trustees and the [Task Force] that during the course of FSS's independent investigation performed hereunder, FSS will immediately report any discovered evidence of criminality to the appropriate law enforcement authorities, and provide notice of such reporting to the [Task Force].

[…]

FSS also will communicate regarding its independent investigation performed hereunder with media, police agencies, governmental authorities and agencies, and any other parties, as directed by the [Task Force]. However, it also is understood by FSS, the Trustees and the [Task Force] that neither the Trustees nor the [Task Force] will interfere with FSS's reporting of evidence of criminality or identities of any victims of sexual crimes or exploitation discovered throughout the course of FSS's independent investigation performed hereunder, as discussed in the paragraph immediately above.

*Id.* at pages 1-2, ¶ 1 (emphasis added).

In a subsequent paragraph titled "Retention of Third Parties," the Engagement Letter provides that "For the purpose of providing legal services to the [Task Force], FSS will retain [FGIS] to assist in this engagement." *Id.* at page 5, ¶ 5.

Paragraph six governs the confidentiality of the relationship:

> **The work and advice which is provided to the [Task Force]** under this engagement by FSS, and any third party working on behalf of FSS to perform services in connection with this engagement, is subject to the confidentiality and privilege protection of the attorney-client and attorney work product privileges, unless appropriately waived by the parties or otherwise determined by law.

*Id.* at page 5, ¶ 6 (emphasis added). Paragraph 7 governs the responsibilities of attorney and client:

> **FSS will provide the above-described legal services for the [Task Force's] benefit, for which the Trustees will be billed in the manner set forth above.** We will keep the [Task Force] apprised of developments as necessary to perform our services and will consult with the [Task Force] as necessary to ensure the timely, effective, and efficient completion of our work.

*Id.* at pages 5-6, ¶ 7 (emphasis added).

Paragraph nine, titled "Engagement Limited to Identified Client," provides: "This will also confirm that, unless we otherwise agree in writing, our engagement is solely related to the [Task Force] established by the [Penn State] Board of Trustees and the specific matter described above." *Id.* at page 6, ¶ 9. Paragraph ten, governing termination, provides that "Our engagement may be terminated at any time by FSS or the [Task Force] upon written notice and, with respect to FSS, consistent with our ethical and professional obligations." *Id.* at 7, ¶ 10. Paragraph 11, regarding client files, provides that "[i]n the course of our representation of the [Task Force], we will maintain a file containing, for example, correspondence, pleadings, agreements, deposition transcripts, exhibits, physical evidence, expert reports, and other items reasonably necessary **for the [Task Force's]**

**representation**[.]" *Id.* at 7, ¶ 11 (emphasis added). Finally, in its concluding paragraph, the Engagement Letter states that "FSS, of course, is delighted to be asked to **provide legal services to the [Task Force]**, and we are looking forward to working with the [Task Force] on this engagement." *Id.* at page 7 (emphasis added).

Freeh signed the Engagement Letter on behalf of FSS. The chair of Penn State's Board of Trustees signed the Engagement Letter under the heading "Approved and Agreed to on Behalf of The Board of Trustees of the Pennsylvania State University." *Id.* at page 8. Likewise, the Task Force chair signed the Engagement Letter under the heading "Approved and Agreed to on Behalf of the [Task Force] Established by The Board of Trustees of the Pennsylvania State University." *Id.*

In summary, the Engagement Letter consistently draws a distinction between Penn State's board of trustees and the Task Force. The letter consistently identifies the Task Force as the party for whom FSS was performing services. Appellants do not cite any legal authority precluding an entity such as Penn State from hiring and paying a law firm to represent a task force of the entity's creation.[7] Nor do Appellants cite any authority

_____

[7] We note that Rule of Professional Conduct 1.8(f) and explanatory comment 11 permit compensation by a third party. Pa.R.P.C. 1.8(f). The client must give informed consent, and there must be no "interference with the lawyer's independence of professional judgment or with the client-lawyer

*(Footnote Continued Next Page)*

precluding the parties from limiting the attorney-client relationship to the law firm and the task force, if desired. Furthermore, Appellants cite no authority to support their contention that the Task Force, in order to become a client of FSS, needed to be a distinct legal entity. The signature on the Engagement Letter Steve A. Garban, chair of Penn State's board of trustees was necessary, given that the trustees were paying FSS's bills. We therefore do not view Garban's signature as "fatally inconsistent" with a conclusion that the Task Force was the client, as Appellants claim. *See* Appellants' Supplemental Brief at 21. The signature by the Task Force chair, Kenneth C. Frazier, on the other hand, undercuts Appellants' argument. If Penn State was the client, and if the Task Force had no identity distinct from Penn State, Frazier's signature would be superfluous. As it is, Frazier's signature on behalf of the Task Force is consistent with the terms of the rest of the Engagement letter, which consistently and repeatedly identifies the Task Force as the client.

Appellants also argue that the trial court placed undue weight on Freeh's testimony. Appellants claim Freeh's testimony, coming well after the signing of the Engagement Letter and issuance of the Freeh Report, does not

*(Footnote Continued)* ───────────────

relationship." *Id.* Likewise Rule 5.4(c) provides that a "lawyer shall not permit a person who recommends, employs or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment rendering such legal services." Pa.R.P.C. 5.4(c). *See also*, Pa.R.P.C. 5.4(c), explanatory comment 2.

alter the circumstances of the representation. A similar criticism could be made, however, of Appellants' reliance on letters authored by its general counsel and outside counsel, both of which post-date the Engagement Letter and the commencement of FSS's representation of the Task Force. In our view, Freeh's testimony is consistent with the Engagement Letter. We do not believe the trial court overemphasized or erred in relying upon Freeh's testimony.

In summary, Appellants have failed to offer any authority upon which we can conclude that the trial court erred, as a matter of law, in finding that FSS confined its representation to the Task Force.[8] We will not disturb the trial court's finding, supported by the record, that Penn State cannot assert attorney-client privilege because it was not the client of FSS.[9]

Next, we address the parties' challenges to the trial court's work product rulings. "The protection against the discovery of work product is designed to shelter the mental processes of an attorney, providing a

---

[8]  Implicitly, Appellants challenge the trial court's findings of fact, credibility determinations, and interpretation of the Engagement Letter. Appellants do not cite any legal principles governing these issues. Appellants have confined their argument to the trial court's legal conclusion that Penn State failed to establish that attorney-client privilege applies. We have confined our analysis and holding accordingly.

[9]  We thus affirm Paragraph 1 of the trial court's August 12, 2016 order (appended to this opinion). In Paragraph 1, the trial court identified categories of documents that contain unprivileged communications between Penn State and FSS.

privileged area within which he can analyze and prepare his client's case."

***Birth Ctr. v. St. Paul Companies, Inc.***, 727 A.2d 1144, 1165 (Pa. Super. 1999), ***aff'd***, 787 A.2d 376 (Pa. 2001); ***disapproved on other grounds by Mishoe v. Erie Ins. Co.***, 824 A.2d 1153 (Pa. 2003).  "The underlying purpose of the work product doctrine is to guard the mental processes of an attorney, providing a privileged area within which he can analyze and prepare his client's case."  ***Bagwell v. Pennsylvania Dep't of Educ.***, 103 A.3d 409, 415-16 (Pa. Cmwlth. Ct. 2014), ***appeal denied***, 117 A.3d 1282 (Pa. 2015) (quoting ***Commonwealth v. Sandusky***, 70 A.3d 886, 898 (Pa. Super. 2013), ***appeal denied***, 81 A.3d 77 (Pa. 2013)).

Work product Rule 4003.3 of the Rules of Civil Procedure governs work product doctrine:

> Subject to the provisions of Rules 4003.4 and 4003.5, a party may obtain discovery of any matter discoverable under Rule 4003.1 even though prepared in anticipation of litigation or trial by or for another party or by or for that other party's representative, including his or her attorney, consultant, surety, indemnitor, insurer or agent.  The discovery shall not include disclosure of the mental impressions of a party's attorney or his or her conclusions, opinions, memoranda, notes or summaries, legal research or legal theories.  With respect to the representative of a party other than the party's attorney, discovery shall not include disclosure of his or her mental impressions, conclusions or opinions respecting the value or merit of a claim or defense or respecting strategy or tactics.

Pa.R.C.P. No. 4003.3.[10]   Whether the trial court properly interpreted and applied Rule 4003.3 presents a question of law.  ***Barrick v. Holy Spirit Hosp. of the Sisters of Christian Charity***, 32 A.3d. 800, 808 (Pa. Super. 2011), ***aff'd***, 91 A.3d 680 (Pa. 2014).  Our standard of review is *de novo* and our scope of review is plenary.  ***Id.***

As noted above, the trial court ordered production of some non-verbatim interview notes and memoranda prepared by FSS attorneys and FGIS investigators.  Each interview was conducted by one FSS attorney and one FGIS investigator.  The attorneys and investigators took notes at the interviews and synthesized their notes into an agreed-upon interview summary.  The trial court found that "[t]hese memoranda contain a confluence of the statements made by the interviewees and the mental impressions, conclusions, and opinions of the interviewer."  Trial Court Opinion, 8/12/16, at 10-11.  The trial court ordered the notes and memoranda produced so long as the interviewer's mental impressions, conclusions, and opinions were redacted.  ***Id.***

The plain language of Rule 4003.3 states that work product applies to a party's attorney and other representative or agent.  With respect to the attorney, the Rule provides that "discovery shall not include disclosure of the

---

[10]   Rules 4003.5 and 4003.5 are not relevant here, as they govern trial preparation material.

mental impressions of a party's attorney or his or her conclusions, opinions,

**memoranda, notes or summaries**, legal research or legal theories."

Pa.R.C.P. No. 4003.3 (emphasis added).

We first turn for guidance to the explanatory comment accompanying

Rule 4003.3.

> The amended Rule radically changes the prior practice as to discovery of documents, reports and tangible things prepared in anticipation of litigation or for trial by or for another party or by or for that party's representative, including his attorney, consultant, surety, indemnitor, insurer or agent.
>
> Former Rule 4011(d) expressly prohibited such discovery. The amended Rule permits it, subject to the limitation that discovery of the work product of an attorney may not include disclosure of the mental impressions, conclusions, opinions, memoranda, notes, legal research or legal theories of an attorney. As to any other representative of a party, it protects the representative's disclosure of his mental impressions, conclusions or opinions respecting the value or merit of a claim or defense or respecting strategy or tactics. Memoranda or notes made by the representative are not protected.

Pa.R.C.P. No. 4003.3, comment. The comment reinforces the protection of,

among other things, an attorney's mental impressions, memoranda, and

notes.[11]

---

[11] In construing the Rules of Civil Procedure, this Court may rely on the principles of statutory construction. ***Howarth v. DiGrazio***, 142 A.3d 877, 880 (Pa. Super. 2016). The parties have not briefed the principles of statutory construction. Their arguments rest on the plain language of Rule 4003.3. We confine our analysis accordingly.

For the policy underlying protection of an attorney's interview notes, Appellants rely on **Upjohn Co. v. U.S.**, 449 U.S. 383 (1981). The **Upjohn** Court noted the general prohibition[12] of permitting discovery of "written statements, private memoranda and personal recollections prepared or formed by an adverse party's counsel in the course of his legal duties." **Id.** at 397 (quoting **Hickman v. Taylor**, 329 U.S. 495, 510 (1947)). Thus, "it is essential that a lawyer work with a certain degree of privacy." **Id.** at 397-98. Were it otherwise, the Supreme Court reasoned, "much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own." **Id.** at 398. Further, the Court wrote that "[f]orcing an attorney to disclose notes and memoranda of witnesses' oral statements is particularly disfavored because it tends to reveal the attorney's mental processes […] what he saw fit to write down regarding witnesses' remarks […] the statement would be his [the attorney's] language, permeated with his inferences." **Id.** at 399-400 (citations omitted; brackets added in **Upjohn**). While **Upjohn** is not binding on this Court, we find its analysis persuasive and in accord with the text of Rule 4003.3 and its explanatory comment. Indeed, Rule 4003.3 explicitly

_____

[12] Federal Rule of Civil Procedure 26(b)(3)(A)(ii) permits discovery of work product if a party shows "substantial need" for the materials and that it cannot, "without undue hardship, obtain their equivalent by other means." F.R.C.P. 26(b)(3)(A)(ii). Pennsylvania Rule 4003.3 contains no analogous provision.

identifies memoranda and notes as worthy of protection because, as *Upjohn* explains, notes and memoranda are highly likely to reflect an attorney's mental impressions, opinions, and conclusions—the other items explicitly protected by the Rule. A contrary result would discourage written notes and summaries such as those presently at issue. The trial court erred in ordering Appellants to produce redacted copies of FSS attorney interview notes and summaries. Work product doctrine protects those documents in their entirety.

The same result does not obtain for the notes of FGIS investigators. Concerning representatives other than the party's attorney, the Rule protects only "representative's disclosure of his mental impressions, conclusions or opinions respecting the value or merit of a claim or defense or respecting strategy or tactics." Pa.R.C.P. No. 4003.3. The explanatory comment clarifies, "[m]emoranda or notes made by the representative are not protected." Pa.R.C.P. No. 4003.3, explanatory comment.[13] Thus, Rule 4003.3 protects FGIS investigator notes only to the extent that those notes reflect "mental impressions, conclusions or opinions respecting the value or

_____

[13] We are cognizant that explanatory comments express the opinion of the rules drafting committee and therefore are not binding. *Johnson v. Bullock-Freeman*, 61 A.3d 272, 276 (Pa. Super. 2013).

merit of a claim or defense or respecting strategy or tactics." Pa.R.C.P. No. 4003.3.[14]

Appellees argue that work product does not protect the notes and memoranda of the FSS attorneys and FGIS investigators because those notes and memoranda were not prepared in anticipation of litigation. We disagree. Rule 4003.3 permits discovery of work product, so long as the work product does not reflect or include "mental impressions of a party's attorney or his or her conclusions, opinions, memoranda, notes or summaries, legal research or legal theories." Pa.R.C.P. No. 4003.3. Work product that does not reflect or include these items is discoverable "even though" prepared in anticipation of litigation. *Id.* Thus, the Rule does not limit work product protection to materials prepared in anticipation. Rather, materials prepared in anticipation are not automatically protected. Nowhere does the Rule limit its protection of "mental impressions of a party's attorney

---

[14] Paragraph 3 of the trial court's August 12, 2016 order (see appendix) identified the documents the trial court found to be discoverable over Appellants' work product claim. We hold that attorney interview notes are not discoverable, even in redacted form. FGIS investigator notes are discoverable but must be redacted insofar as they contain "mental impressions, conclusions or opinions respecting the value or merit of a claim or defense or respecting strategy or tactics." Pa.R.C.P. No. 4003.3. The interview summaries, which are an agreed-upon synthesis of the notes of the FSS attorney and the FGIS investigator, need not be produced. Insofar as anything reflected in those summaries is discoverable, Appellees can glean that information from the un-redacted portions of the FGIS investigator notes.

or his or her conclusions, opinions, memoranda, notes or summaries, legal research or legal theories" to materials prepared in anticipation.

Moreover, Appellees' reliance on federal law is misplaced. Federal Rule 26(b)(3)(A) cabins work product protection to matters prepared in anticipation of litigation. F.R.C.P. 26(b)(3)(A) ("Ordinarily, a party may not discover documents and tangible things **that are prepared in anticipation of litigation** [….]") (emphasis added). As explained above, Rule 4003.3 does not similarly cabin Pennsylvania's work product privilege. For this reason, we believe federal cases interpreting Rule 26(b)(3)(A) are not persuasive on this point. Appellees cite several Pennsylvania cases (Appellees' Opening Brief, at 13), but they are inapposite. Appellees rely on a footnote in **Commonwealth v. Williams**, 86 A.3d 771, 782 n.7 (Pa. 2014), but that footnote simply cites federal cases. Moreover, the scope of the work product privilege was not before the **Williams** Court. Appellees cite a footnote in **Gillard v. AIG Ins. Co.**, 15 A.3d 44, 59 n.16 (Pa. 2011), but there, the Supreme Court expressly limited its holding: "Moreover, **while it is beyond the scope of this opinion to determine the precise breadth of the privilege**, we note that Rule 4003.3, on its overall terms, manifests a particular concern with matters arising in anticipation of litigation." **Id.** (emphasis added). Indeed, the issue before the **Gillard** Court was "whether, and to what degree, the attorney-client privilege attaches to attorney-to-client communications." **Id.** at

Our Commonwealth Court addressed this issue head on in ***Bagwell***. There, the document requester[15] was seeking information (related to the Sandusky scandal and the FSS investigation) from the Pennsylvania Secretary of Education, in his capacity as an *ex officio* member of Penn State's board of trustees. ***Bagwell***, 103 A.3d at 411. The Commonwealth Court held that work product doctrine protects "mental impressions, theories, notes, strategies, research and the like created by an attorney in the course of his or her professional duties, *particularly in anticipation or prevention of litigation*[.]" ***Id.*** (quoting ***Levy v. Senate of Pennsylvania***, 94 A.3d 436 (Pa. Cmwlth. Ct. 2014) (italics added in ***Bagwell***)). The requester asked the Commonwealth Court to hold that work product doctrine applies only to materials prepared in anticipation of litigation. The Commonwealth Court declined, reasoning that Rule 4003.3's protection of mental impressions is unqualified. ***Id.*** at 416-17 (quoting ***Sedat v. Department of Environmental Resources***, 641 A.2d 1243 (Pa. Cmwlth. Ct. 1994) (single judge opinion)). Thus, materials that contain mental impressions are protected regardless of whether they are prepared in anticipation of litigation. ***Id.*** at 417. In a later proceeding, the Commonwealth court reiterated that "[p]rotection of an attorney's mental

---

[15] The requester relied on the Right To Know Law ("RTKL"), 65 P.S. §§ 67.101, *et. seq.*, 2008 Pa. Laws. 6, No. 3.

impression is unqualified." ***Bagwell v. Pennsylvania Office of Attorney General***, 116 A.3d 145, 148 (Pa. Cmwlth. Ct. 2015). The Commonwealth Court's decisions do not bind this Court. Nonetheless, we cite it as persuasive authority in support of our own analysis. We reject Appellees' assertion that work product protection is limited to materials prepared in anticipation of litigation.

Next, we consider Appellees' arguments challenging the trial court's post-remand order. The trial court ruled that various non-source documents were not discoverable because they are not relevant to any of Appellees' causes of action. Appellees argue the trial court erred in so doing. Before we address this argument on its merits, we must consider Appellants' assertion that an order denying discovery is interlocutory and not immediately appealable.

Initially, we exercised jurisdiction over this appeal pursuant to Pa.R.A.P. 313, which permits an interlocutory appeal from orders "separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost." Pa.R.A.P. 313(b). The trial court's order overruling Appellants' claims of attorney-client privilege and work product protection is immediately appealable under Rule 313. ***Berkeyheiser v. A-Plus Investigations, Inc.***, 936 A.2d 1117, 1124 (Pa. Super. 2007). This is so

because a claim of privilege is irreparably lost if a party is forced to disclose privileged documents. *Id.*

As explained above, we remanded for clarification of the documents at issue and the specific nature of Appellants' objections. At the conclusion of the post-remand proceedings, the trial court found that many of the documents Appellees' seek are irrelevant to any of Appellees' causes of action. The trial court's post-remand ruling does not require disclosure of evidence over a party's assertion of privilege, and therefore does not implicate the collateral order doctrine as set forth in Rule 313 and *Berkeyheiser*. Appellees do not dispute that appellate review of an order denying discovery of irrelevant material would ordinarily await an appeal from a final order. They argue instead that immediate review of the order denying discovery is proper in light of this Court's remand instructions:

> 8. This Court shall retain jurisdiction over these appeals until this Court resolves all remaining issues. If any issues remain for review, this Court shall notify the parties if it desires additional briefing on any remaining issues. It shall not be necessary for the parties to file additional appeals to his Court from any rulings by the trial court under this Order.

> 9. The entry of this Order is without prejudice to the issues already raised and preserved by the parties for review by this Court at the above-consolidated appeal numbers.

Order, 4/26/16, at ¶¶ 8-9.

Prior to remand, Appellants were the appealing party, and the issues they preserved challenged the order directing production of documents over

Appellants' claims of attorney-client privilege and work-product. Our order clarified that, given our retained jurisdiction, no further notices of appeal would be necessary. Our order did not and could not expand the scope of this Court's permissible jurisdiction under Rule 313. Nor did it expand our basis for exercising jurisdiction over this appeal in the first instance.[16] We can retain only so much jurisdiction as we originally had.

Furthermore, we do not prejudice Appellees by declining to review the trial court's relevance finding on this appeal. Had the trial court ruled, prior to remand, that some of the documents Appellee sought were irrelevant, Appellees would have had no jurisdictional basis for obtaining an immediate appeal. Post-remand, their situation is the same. We lack jurisdiction to review an order denying discovery of allegedly privileged information.[17]

Finally, we have before us Appellants' applications to discontinue these appeals. Appellants represent that on June 30, 2017, the Paterno Parties filed a praecipe to discontinue this action in the Centre County Court of Common Pleas. By virtue of Rule 1701(c) of the Appellate Rules of Procedure, the trial court retained jurisdiction over the Paterno parties'

---

[16] All three of the above-captioned appeals were Appellants' appeals from orders that directed the disclosure of documents.

[17] We therefore do not address Paragraph 2 of the trial court's August 12, 2016 order.

- 28 -

action, exclusive of the collateral issues before us in this interlocutory appeal. Pa.R.A.P. 1701(c). However, Rule 1973(b) provides:

> If an appeal has been docketed in the appellate court, the prothonotary or clerk of the lower court or the clerk of the government unit **shall not accept a *praecipe* to discontinue the action until it has received notice from the appellate court prothonotary or certification of counsel that all pending appeals in the action have been discontinued.**

Pa.R.A.P. 1973 (emphasis added). Thus, the Paterno Parties' discontinuance, and any trial court order permitting a discontinuance, were a nullity. The present discovery appeal remains within the exclusive jurisdiction of this Court and deprives the trial court of any authority to accept or grant a discontinuance of an action until receipt of proper notice that ***all*** appeals pending in this Court have been discontinued. Apart from the clear dictates of Rule 1973, to hold otherwise would create the anomalous situation where the disposition of an appeal and the attendant remand of the record would not be capable of returning to the action from which they derived.

In their application, Appellants, citing ***Motley Crew, LLC v. Bonner Chevrolet Co., Inc.***, 93 A.3d 474 (Pa. Super. 2014), ***appeal denied***, 104 A.3d 526 (Pa. 2014), argue this Court is bound to discontinue this appeal because there no longer is an action over which a court may exert jurisdiction. We find Appellants' argument misplaced. In ***Motley Crew***, the appellants discontinued their case in the trial court **before** filing an appeal. ***Id.*** at 475. The appellants believed, incorrectly, that they could render an

otherwise interlocutory order final and appealable by discontinuing their action. *Id.* This Court disagreed and quashed the appeal, concluding that the appellants rendered their appeal moot by discontinuing their case against all parties. *Id.* at 478. There no longer was an action from which an appeal could be taken. Here, the interlocutory appeal was pending well before the Paterno Parties sought to discontinue the underlying action in the trial court. Unlike the attempted appeal in *Motley Crew*, the instant appeal was viable at the time it was appealed to this Court. Once this appeal was filed, this Court possessed jurisdiction over the interlocutory matters raised on appeal to the exclusion of the trial court. The Paterno Parties could not divest this Court of jurisdiction by attempting to discontinue their action in the trial court while the matter was still pending in this Court. *Motley Crew* therefore, does not govern the jurisdictional issue presently before this Court.

We now must decide whether to grant Appellants' application to discontinue this appeal, despite the substantial time and resources this Court has invested in reviewing and deciding this matter. Rule 1973 permits an appellant to "discontinue an appeal or other matter as to all appellees as a matter of course until 14 days after the date on which the appellee's principal brief is due, or thereafter by leave of court upon application." Pa.R.A.P. 1973(a). Case law on this Rule is sparse. However, in *Marino by Marino v. Marino*, 601 A.2d 1240 (Pa. Super. 1992), this Court declined to

allow the appellant to discontinue after oral argument occurred. This Court noted that the appellant allowed the case to proceed through extensive briefing, application of the machinery of this Court and, finally, oral argument before requesting a discontinuance. In declining to permit the discontinuance, we stated "[w]e will not allow a litigant to avail himself the full process of the court, and then permit that litigant to remove the case from the court's jurisdiction at the very last possible moment." *Id.* at 1243. *See also*, *Levine v. Levine*, 520 A.2nd 466 (Pa. Super. 1987) (petition to discontinue an appeal denied when filed subsequent to argument and prior to the filing of the appellate court's opinion and order), *Lowery v. East Pike Lynn Township*, 599 A.2d 271 (Pa. Cmwlth. 1991), (discontinuance denied when subsequent to argument appellant sought permission to discontinue an appeal but failed to state with particularity the grounds upon which the request was based).

Instantly, this Court has devoted considerable time and resources to this appeal, including a detailed remand for clarification of the issues before us. Moreover, the issues we have addressed are of significance to the entire bench and bar. Because the panel has twice heard argument and reviewed two sets of briefs (pre- and post-remand), and because the panel has reached agreement on the merits, we deny the application to discontinue.

For all of the foregoing reasons, we affirm the trial court's order in part, reverse in part, and remand for further proceedings in accordance with this opinion.

Order affirmed in part and reversed in part. Case remanded. Applications denied. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/25/2017

Accordingly, the Court enters the following Order:

## **ORDER**

AND NOW, this ⟨11⟩ day of ~~July~~ August. 2016, the Court hereby ORDERS:

1) The following categories of the Privilege Log are discoverable as they contain
   unprivileged communications:

   a. Category 11a. Substantive communications between members of the Freeh Team
      and members of Penn State's Board of Trustees ("BOT") or Special Investigative
      Task Force ("SITF") that are within the scope of 42 Pa.C.S. § 5928

      i. Insofar as said communications were made to non-members of the SITF.

   b. Category 12 a. Communications between members of the Freeh Team and other
      attorneys for PSU (e.g., F. Guadagnino, C. Baldwin. L. Davis, D. Walworth, J.
      O'Dea) that are within the scope of 42 Pa.C.S. § 5928

   c. Category 12b. Documents containing internal discussions among members of the
      Freeh Team re: communications between members of the Freeh Team and other
      attorneys for PSU (e.g., F. Guadagnino, C. Baldwin. L. Davis, D. Walworth. J.
      O'Dea) that are within the scope of 42 Pa.C.S. § 5928

      i. Insofar as said discussions reflect the substantive material of said
         communications.

   d. Category 13. Documents containing internal discussions among members of the
      Freeh Team re: communications with third parties (e.g., OAG, NCAA, Big Ten)

      i. Insofar as said discussions reflect the substantive material of said
         communications.

12

2) The following categories of the Privilege Log are undiscoverable as they contain irrelevant material:

    a. Category 1. Documents containing internal discussions among members of the "Freeh Team" (Freeh Sporkin & Sullivan, Freeh Group International Solution, Pepper Hamilton) re: interim recommendations provided to PSU in February 2012

    b. Category 2a. Draft of the Freeh Report or individual chapters thereof

    c. Category 2b. Documents containing internal discussions among members of the Freeh Team re: draft chapters, possible findings, possible recommendations

    d. Category 3a. Drafts of chapters/sections that were not included in the final Freeh Report

    e. Category 3b. Documents containing internal discussions among members of the Freeh Team re: drafts of chapters/sections that were not included in the final Freeh Report

    f. Category 4. Drafts of and documents containing internal discussions among members of the Freeh Team re: press release/L. Freeh remarks upon issuance of Freeh Report

    g. Category 5. Legal research memoranda, including discussion or analysis in preparation for drafting

    h. Category 6. Documents containing internal discussions among members of the Freeh Team re: the plan for the investigation/the progress thereof

    i. Category 7b. Drafts, documents containing internal discussions among members of the Freeh Team, comments, summaries re: memos of interviews cited in the Freeh Report—then-current PSU employees, trustees, emeritus trustees

13

j. Category 8b. Drafts, documents containing internal discussions among members of the Freeh Team, comments, summaries re: memos of interviews cited in the Freeh Report—all others

k. Category 8b. Drafts, documents containing internal discussions among members of the Freeh Team, comments, summaries re: memos of interviews cited in the Freeh Report—all others

l. Category 9b. Drafts, documents containing internal discussions among members of the Freeh Team, comments, summaries re: memos of interviews not cited in the Freeh Report—then-current PSU employees, trustees, emeritus trustees

m. Category 10b. Drafts, documents containing internal discussions among members of the Freeh Team, comments, summaries re: memos of interviews not cited in the Freeh Report—all others

n. Category 11b. Documents containing internal discussions among members of the Freeh Team re: Substantive communications between members of the Freeh Team and members of Penn State's Board of Trustees ("BOT") or Special Investigative Task Force ("SITF") that are within the scope of 42 Pa.C.S. § 5928

3) The following categories of the Privilege Log are partially discoverable:

a. Category 7a. Memos of interviews cited in the Freeh Report—then-current PSU employees, trustees, emeritus trustees

b. Category 8a. Memos of interviews cited in the Freeh Report—all others

c. Category 9a. Memos of interviews not cited in the Freeh Report—then-current PSU employees, trustees, emeritus trustees

d. Category 10a. Memos of interviews not cited in the Freeh Report—all others

14

4) All of the Court's discovery findings contained in this Order are to be interpreted in collaboration with the findings in the attached Opinion.

BY THE COURT:

_____

John B. Leete, Senior Judge
Specially Presiding

15